Nott, J.,
delivered the opinion of the court:
In July, 1873, the defendants were indebted to the Buffalo Bayou, Brazos and Colorado Railroad Company for services performed, and the company was indebted to John G. Tod and his wife for money advanced. The road at that time was insolvent and in the hands of trustees, of whom the claimants are the survivors; but in the view which the court takes of this case, no question as to the power or authority of the trustees arises. The account of the company against the government was unliquidated, and apparently in doubt j and the amount in which the company was indebted to Mr. Tod and his wife, if liquidated and known to the trustees, has not been shown to the court.
This being the relation or position of the three parties (the railroad company, the government, and Mr. Tod), the trustees, in 1873, executed a power of attorney to Mr. Tod, authorizing him to collect the claim and apply the moneys collected upon the indebtedness due to himself and wife. Mr. Tod apparently proceeded to get the account examined and adjusted by the .accounting officers of the Treasury; and he so well succeeded ■that on the 23d September, 1873, an account was stated by the Third Auditor, and admitted and certified by the Second 'Comptroller, for a balance of $18,938.79; and on the 25th September, 1873, a Treasury draft was drawn for that amount in the usual form.
Up to this time everything had been done, according to the usual rule and practice of the Treasury, in the name of the original creditors, the Buffalo Bayou, Brazos and Colorado Railroad Company. The account had been stated as their account; the balance certified was certified as due to them, and the draft for that balance was drawn in terms, “Pay to the order of Buffalo Bayou, Brazos and Colorado Railroad Co.” Up *245 to tbis time, it is also to be noted, no question of controversy bad arisen. Tbe account of tbe railroad company bad been properly adjusted; they or tbeir successors, tbe trustees, were tbe owners of that claim or cbose in action; Mr. Tod’s authority to act as agent or attorney in getting tbe claim adjusted bad not been revoked; tbe amount of tbe balance certified was not a matter of dispute; tbe draft is conceded to bave been for the proper amount and in proper form. Tbe only matter in controversy is subsequent, and relates to tbe indorsement of tbe draft — whether power or authority bad been given to any person to indorse that draft in tbe name of tbe payees, tbe Buffalo Bayou, Brazos and Colorado Bailroad Co.”
On tbe very day that tbe draft was drawn in tbe Treasury in Washington a power of attorney was executed in Galveston, by Mr. Tod, in favor of one E. N. Houghton, a claim agent doing business in Washington; and on tbe 30th September tbe First Comptroller indorsed tbis order to tbe Treasurer upon tbe draft, “Pay on the indorsement of JS. If. Houghton, attorney in fact.” Tbe draft was thereupon delivered to Houghton, who indorsed it “B. N. Houghton, attorney in fact”; and upon tbis indorsement tbe Treasurer paid tbe amount thereof to him. Tbe question whether be was tbe attorney of tbe railroad or of tbe claimants for tbe purpose of indorsing that draft and collecting tbe proceeds thereof is tbe substantial question of controversy before tbe court.
It is, indeed, contended by tbe defendants that no action can be maintained upon tbis draft by tbe claimants, and that they should be remitted to tbe original cause of action, tbe services for which tbe draft was given in payment, long since barred by tbe statute of limitations. But we are of a contrary opinion. In tbe case of McKnight (13 C. Cls. R., 292), the whole subject of tbe Treasury practice in adjusting accounts and paying the debts of tbe government received a thorough and exhaustive examination at the bands of our brother Richardson, whose conclusions were affirmed and adopted by tbe Supreme Court. (98 H. S. B., 179.) By that opinion it is clearly — we think incontestably — shown that tbe different processes by which demands against tbe government are adjusted are matters of accounting ex parte, and indeed confidential, until tbe claimant receives a draft upon tbe Treasurer in Washington, or upon an assistant treasurer or designated depositary in some other *246 place. But as to such drafts, it is said (p. 305) that they “are understood to constitute new contracts on the part of the government, into which the previous claims upon which they issue a/re merged, and are valid and binding upon the United States in the hands of bona fide holders, by indorsement for valuable consideration, as commercial bills of exchange and promissory notes are between individuals.” Further reflection has only confirmed in our minds the soundness of these views; and we, indeed, think it would work great public inconvenience, and frequently great wrong and injustice, if such evidences of indebtedness could be ignored at the option of the party who issued them, and public creditors be necessarily remitted to their primary cause of action.
It is also contended by the defendants that the claimants cannot maintain an action on this draft, which was never in their possession; or that if they ratify the agency as to the issuance of the draft, they ratify it as to all that their agent did in procuring payment of the claim. The objection is ingenious, and has a plausible air, but we apprehend a man may send his clerk to his debtor to settle an account and receive a check for the balance which may be found due without authorizing thereby the clerk to indorse his name upon the check, or to collect it at the bank; and we likewise think that if a draft or other negotiable evidence of indebtedness were thus delivered by the debtor to the agent, in settlement of his debt, it would become the creditor’s eo instanti on delivery, and that he might maintain an action upon it if it were lost, or if the debtor had paid it upon a forged indorsement, though it might never have come to his actual custody.
The authority of E. N. Houghton to indorse 'and collect the draft as agent in fact of the payees or of the claimants, their successors and legal representatives, rested, as has been said, upon two powers of attorney, the one given by the trustees of the railroad company to Mr. Tod, and the other given by Mr. Tod to Houghton. The first of these instruments recites that a portion of the company’s accounts against the government had been rejected, and that Mr. Tod thought that he might “by the expenditure of time and money succeed in obtaining some additional sum from the government,” and it then empowers “the said J. G-. Tod to talee such steps as to him may seem proper to recover from the United States G-overnment any sum *247 or sums that may be due and owing the said company, and apply such sum as he may recover to the payment of the indebtedness of said company to said J. G-. Tod and to his wife.” The instrument was exceedingly loose and ambiguous in terms. It did not profess to assign the claim; nor did it empower the agent to delegate his authority; nor did it authorize him to indorse drafts or give acquittances in the name of the principal, nor did it express a consideration. But it did provide that if there should “be any excess” Mr. Todd was to pay it over to the undersigned,” and also that the company was “ to be subjected to no expense in the effort to malee the above collection.” As to the subsequent power given by Mr. Tod, it was in the ordinary form of wha.t is known as a full power of attorney, and was ample in the authority which it conveyed — provided, of course, that Mr. Tod possessed any such authority and was authorized to delegate it.
Whether the power of attorney given by the trustees was sufficient, by the law of Texas or at common law, to operate as an equitable assignment of the claim, or to enable Mr. Tod to delegate his authority as attorney, or to give acquittances to the government, or to indorse the draft, which, by the well-settled usage of the Treasury, would be given in payment if anything were to be collected, is a question which was not argued on the trial, and upon which the court expresses no opinion. The claimants contended at the bar that the power was wholly void, under the Act 26th February, 1853 (10 Stat. L., 170, ch. 81; Rev. Stat., § 3477); and the defendants contended that if void under the statute a payment upon it nevertheless was valid within the decision of this court in Bailey’s Case (15 C. Cls. B., 490).
The statute, as construed by the Supreme Court in Spofford v. Kirk (97 U. S. R., 484), undoubtedly operated upon this instrument so as to render it wholly void. Nevertheless, while courts of the United States cannot give effect to such powers or assignments so long as they remain unexecuted, they cannot ignore consummated transactions under them by either permitting the assignor to recover from the assignee the money paid him or by compelling the government, whose officers have acted on the faith of such an instrument, to pay the debt a second time. The purpose of the statute was not to protect individuals, nor to regulate the business transactions of private persons, *248 but to protect tbe government. Tbe purpose is well expressed in tbe title of tbe act 1853 — “An aet to prevent frauds upon the Treasury
Our meaning will perhaps be made clearer by a familiar illustration. A statute of frauds will declare certain agreements to be absolutely void, and no court of the country will be at liberty to enforce them. Nevertheless, if two persons voluntarily enter into such a contract and voluntarily carry it into effect, the one party cannot sue for and recover back the money which be may have paid, and the other cannot sue for and recover a higher price for the goods which be may have sold, and no court will be at liberty to undo what the parties have themselves voluntarily done. This statute to prevent frauds upon the Treasury is of the nature of a statute of frauds. It was designed to absolve the Treasury from all complicity in or responsibility for the sale or assignment of claims until they bad reached the point where in the form of drafts they would be merged in negotiable evidences of debt, and where, the amount being ascertained and fixed, the assignment or power of attorney could describe the chose assigned with the most accurate exactitude and certainty. At the same time the statute did not forbid the officers of the Treasury from recognizing or acting upon the instruments declared void, nor did it declare the sale and assignment of claims to be champertous or penal. In a word, it left these assignments and powers of attorney precisely where the statute of frauds left the agreements which it declares void — as instruments which cannot be enforced at law,, but which, when voluntarily given by the government creditors, and voluntarily carried into effect by the defendants’ officers, must be deemed by all courts to have expressed and executed the true intent of the parties.
"We, therefore, regard the power or assignment from the trustees to Mr. Tod as taken out of the operation of the statute when the defendants’ officer acted upon the faith of it, and that it is now to be construed and dealt with as if no such statute existed.
As has been said, it is an obscure, loose, and ambiguous instrument, but for that reason is to be construed in favor of an innocent third person, dealing with the assignee or attorney upon the faith of it, most strongly against the party who employed the language, the claimants in this action. the main purpose of the instrument manifestly was to enable Mr. Tod to *249 procure, if be could, the liquidation and allowance of an almost hopeless claim, and at the same time to absolve the claimants absolutely from all cost or liability in the matter of prosecuting and collecting. the immediate consideration moving to the claimants was the expense of the undertaking, which Mr. Tod was to advance. The consideration moving to him was the right to apply whatever proceeds might be realized upon the indebtedness dire to himself and wife. Of course, where a so-called agent is to carry on a business exclusively at bis own expense, and bis so-called principal is in no event to be liable for it, something more than an agency exists. So here Mr. Tod was something more than an agent, for on the one band be was to bear, exclusively, the expense of the undertaking, and on the other be was to control in the first instance and be the primary beneficiary of the funds which might result from it. the intent was that be was to pay himself out of the proceeds, and then account to the trustees for the balance; they were not to receive the money in the first instance, and then pay him his debt after it came to their hands. It was manifestly in view of this not unreasonable construction that the officers of the Treasury acted when they treated Mr. Tod as being the equitable owner of the claim and recognized bis agent and gave effect to bis power of attorney.
But if the Treasury officers’ interpretation of the instrument could not be sustained — if Mr. Dod was not the equitable owner of the claim — if be was a mere agent without an interest, the claimants would still have failed to make out their right to recover.
In the first place, the principal would have owed to the defendants in the case stated a prompt disavowal of the act of bis agent. For a principal in such a case to remain silent for six years, without one word which would put an innocent party, who bad dealt with bis agent on the faith of bis power, though in a misconstruction of it, on bis guard, and enable him to pursue the agent and recover back bis money, is, if not a ratification of the payment, at least such an estoppel as forever closes the mouth of the principal.
In the second place, Mr. Tod was authorized to pay and discharge out of these funds the indebtedness of the claimants to himself and wife. Now, it is manifest that in any controversy between the claimants and Mr. Tod payment to Houghton was payment to bim. "Whatever the claimants might contend, Mr. *250 Tod could neither deny that he was authorized to receive the money nor avoid the consequences of receiving it. In other words, it would be held that the payment to Houghton extinguished pro tanto -the debt of the claimants to Tod. This advantage, whatever it may be, the claimants have undoubtedly received. For anything that appears to the contrary, they have treated the payment to Tod as the extinguishment of their indebtedness to him; and if they have done so, it was as much a ratification as if they had received the money. It is not perceived by the court how a principal can accept a portion of the money collected by his agent and then recover the balance from the debtor on the ground that the whole payment was unauthorized.
But, further than this, the claimants’ case is defective in not showing the amount of their indebtedness to Mr. Tod. For anything that is shown or known to the contrary, they may have been indebted to him in a larger amount than that paid to Houghton. For anything that appears to the contrary, they may have had the full benefit of that payment, and have been discharged of all liability to Tod for that amount. The burden of showing the contrary rests upon them, and their case leaves them in the plight of seeking to recover upon a statutory technicality a debt which already may have been paid, and of which they presumably have received a benefit.
The judgment of the court is that the petition of the claimants be dismissed.