BELKNAP HARDWARE & MFG. CO. et al. v. OHIO RIVER CONTRACT CO. et al.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1921.)

No. 3459.

1. **United States ☞67(3)—Suit on government contractor's bond cannot be maintained in equity.**

   A suit by laborers and materialmen on the bond given by a government contractor to the government for their benefit cannot be maintained in equity.

2. **Subrogation ☞1—Involves substitution in the ownership of a right.**

   Subrogation involves three things, a valuable right, a person who owns the right, and a person who is seeking to be substituted in that ownership.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Subrogation.]

3. **United States ☞74½, New, vol. 12A Key-No. Series—Laborers and materialmen have equitable priority to fund due contractor.**

   Prior to Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), requiring the bond of a government contractor to provide for payment of laborers and materialmen, the government had ir̄ ᵗˢ contracts recognized an obligation to secure the payment of such claʾ and that obligation still exists, notwithstanding the protection afforded the statute, and entitles such claimants to a preference in equity, against general creditors of the contractor, to the fund received from t government.

4. **United States ☞74½, New, vol. 12A Key-No. Series—Government contrᵃ held not to affect priority of laborers and materialmen.**

   A contract between the United States and a contractor, requiring t contractor to pay all liabilities incurred in the prosecution of the wᵈ for labor and material, and providing for payments to be made in cᶜ formity to the specifications, which authorized the 10 per cent. deductⁱ from estimated work, does not affect, one way or the other, the equitaᶦ right of laborers and materialmen to payment from the funds due t contractor in preference to his general creditors.

Appeal from the District Court of the United States for the Wesᵗ ern District of Kentucky; Walter Evans, Judge.

Suit by the Belknap Hardware & Manufacturing Company and otᶦ ers against the Ohio River Contract Company and others. From decree dismissing the bill, complainants appeal. Reversed and rᵉ manded.

The Ohio River Contract Company undertook to build, for the United State a work of river improvement in connection with the Ohio river at Louisvilᶦ It gave the bond to the United States required by the Act of August 13, 189

as amended February 24, 1905 (section 6923, U. S. C. S. 1916), with Bray and Eichel as sureties. It failed to complete the work, and in an action upon the equity side of the court below, brought by a creditor of the contractor, a receiver was appointed for the contractor, and the receiver took over and completed the work, so that it was accepted, and the balance due from the government, being $98,694.64, was paid to the receiver and is now held by him for disbursement, as the court, in the receivership cause, may order. After affairs reached this stage, many of the materialmen and laborers, whose claims had accrued against the contractor before the receiver took over the job, and whom we will hereafter call the claimants, commenced a suit in the court below by the filing of what was called a bill of complaint, which stated the facts already recited, and also alleged that each of the sureties was insolvent, and was also a large general creditor of the contractor. The bill then insisted that the claimants, and others in similar position, were entitled to the whole of the fund so in the hands of the receiver, and that they were also entitled to be subrogated to the exclusion of all other creditors of the insolvent sureties in the claims of those sureties against the contractor and the fund. The bill then prayed that the receiver should pay the fund into court, less costs and expenses, and that the court should distribute the fund among the materialmen and laborers. The amount of claims of this character is said to be in excess of the amount of the fund. The only defendant named in the body of the bill is the contractor, but the title, which is found in the record in connection therewith, names, also, as defendants, the two sureties and the trustee in bankruptcy of one of them, and the receiver. An amendment to the bill shows that the court had given leave to sue the receiver, in an action which is vaguely described, but all parties seem to have treated the leave as sufficient to authorize impleading him in this suit. The receiver answered fully as to the merits of the suit. The surety Bray answered as to the merits, and alleged that he had been discharged in bankruptcy from all demands, including those of the claimants. Bray's trustee in bankruptcy filed a motion to dismiss the action, for reasons some of which formed the basis of the court's later order.

The record shows a number of interlocutory proceedings which we think of no importance. The claimants were very uncertain as to the character of their action. At times they have thought, and they now insist, that it was such an action upon the bond as is contemplated by the statute above referred to. While of this mind, they moved to substitute the United States as the plaintiff in the case. The application was denied. They then moved to transfer to the law side of the docket, but later withdrew this motion. Coming, apparently, to pass upon the trustee's motion to dismiss, the court considered the questions hereafter to be mentioned, and, concluding that the claimants had no lawful cause of action, thereupon dismissed the bill. The court, also, upon his own motion, revoked the order granting leave to sue the receiver, but with a provision that this should be without prejudice to any appellate proceeding or to claimant's future application for such leave on cause shown. From this order of dismissal, the claimants have appealed.

John B. Baskin, of Louisville, Ky. (Baskin & Vaughan, of Louisville, Ky., on the brief), for appellants.

Helm Bruce, of Louisville, Ky. (O. W. McGinnis and W. M. Wheeler, both of Evansville, Ind., and Bruce & Bullitt, of Louisville, Ky., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). The record is full of informalities. No effective notice of the proceedings was ever given to the contractor. We might well dispose of the appeal for this or similar reasons: but the underlying merits of the matter have been so fully presented and argued by counsel for the parties

representing the substantial interests involved that we are confiden
prejudice will arise from a present consideration of these matters,
we think it better to take this course, and leave to subsequent
ceedings the correction of defects that apparently can be easily
plied.

[1] This is, plainly, not a suit upon the bond. Such a suit ca
be maintained in equity. Illinois Surety Co. v. U. S., 240 U. S.
36 Sup. Ct. 321, 60 L. Ed. 609. Any right of action on the bond
barred by time. Texas Co. v. McCord, 233 U. S. 157, 162, 34 Sup
550, 58 L. Ed. 893. Further, we cannot see that the bond has
thing to do with the matter. A judgment on the bond would be wc
less, and the claimants do not ask any such judgment. While the
purpose of the statutory bond is to enable the United States and
terialmen and laborers to collect from the sureties their claims ag:
the contractor, it may be (the point has not been argued and is
decided) that, if claimants have an equitable priority in the fund
mere general creditors, the relations between themselves and the s
ties may also give them priority over the claims of the sureties
material and labor, if such claims they have; but, with this excep
we think whatever is said about the bond in the bill of complaii
surplusage, and we must look to the remainder to find a meritor
case. It seems to be fairly inferable that the government has acce
the work and has paid over the entire balance of the price and ha
claim against the contractor or sureties and has nothing in its han(
disburse. It then appears that the claimants have furnished labor
material, which went into the work which produced the fund,
the sole substantial question is whether they have any equitable lie
priority in the fund as against other creditors of the contractor,
loaned it money or furnished it something besides labor or matei

[2] The matter of subrogation has been argued at length, and n
of the cases cited deal primarily with that subject. We think it
small pertinence. Subrogation involves three elements—a valuable r
a person who owns the right, and a person who is seeking to be
stituted in that ownership. If the claimants have an equitable pri(
in the fund, they need no subrogation; their right is primary;
to assume the existence of a derivative right based on the prir
one is to beg the question whether the latter exists. A brief refer
to the subrogation case chiefly relied upon makes this clear.
Prairie State Bank v. U. S., 164 U. S. 227, 17 Sup. Ct. 142, 41 L.
412, it appeared that a public works contract had been made betwee
United States and a contractor, in 1888, before the existence of
statute which required a surety bond for the benefit of those who
nished labor and material; but, pursuant to custom, the United S
had taken from the contractor a bond with Hitchcock as surety,
ditioned for the faithful performance of the building contract by
contractor. The contract also provided that the United States, a
work progressed, should make monthly payments on estimates,
should retain 10 per cent. of each estimate until the completion o
work, which retained percentage should be forfeited to the U·
States, if the contractor made default, though the extent of the
feiture was made further subject to the discretion of the departr

It is, therefore, plain that the retained percentage in the hands of the United States constituted a security for faithful performance by the contractor. The contractor defaulted, and Hitchcock, the surety, in order to minimize his loss, took over the contract and finished it. Before Hitchcock's assumption of the contract and making of advances, the bank had loaned money to the contractor; the money, apparently, having been used to carry on the contract. Thereupon Hitchcock and the bank became adverse claimants to the retained percentage fund. As the creditor, the United States had two securities for the performance of the contract, one given directly by the principal upon his own property, and one given by the surety of that principal, it seems quite obvious that, when the surety was compelled to pay, he was entitled to be subrogated to the other security held by the creditor against the principal debtor; and so the court held. Such equitable rights in the fund as the bank might have been entitled to came from its voluntary loan to the principal debtor, and hence must be subordinate to the claim of the surety, whose bond was required as a part of the original contract and who had been compelled to pay; and this, also, was held. The relative rights of general creditors and of the laborers and materialmen, if any there were, who had given credit to the contractor were in no way involved in the case. Hitchcock was not subrogated to any such rights; he was subrogated to the United States in its right to use the retained percentage to finish the contract.

[3] Passing, thus, the subject of subrogation, we come back to what we consider the only meritorious question: Did the laborers and materialmen have any right, in analogy to a lien, which would entitle them to equitable priority over other creditors of the contractor in the distribution of the fund? Such right might arise by express contract, or by statute, or upon general principles of equity. In this case there is neither express contract nor express statute. If the right exists, it is to be developed from some equitable considerations.

Mechanic's lien statutes evidence a general recognition of the thought that those who contribute the labor and material going into a structure should have a claim against it for what they have furnished in preference to other creditors of the builder, though the equitable distinction, between those materialmen who are unpaid to-day and the banker who furnished the money which was used to pay those who furnished material yesterday, seems rather arbitrary. It is commonly held that this lien or priority is wholly statutory, and we are not aware of any case (unless those hereafter discussed) where, without the aid of any contract or statute, this vague equity of materialmen and laborers has been thought sufficient to put the owner of the property under obligation to see that they were paid before he settled with the contractor.

It seems, however, that the desire to see this class of claims given some preference was sufficient, so that the United States had some-times thought proper to provide expressly in a contract for public works that it should have the right to withhold payments in case the

contractor did not pay promptly for his labor and materials. Such a situation was involved in Greenville Bank v. Lawrence (C. C. A. 4) 76 Fed. 545, 22 C. C. A. 646; and this contract provision was construed, properly enough, to constitute the fund which was withheld by the United States a security for the payment of these claims. It was further held, and it necessarily followed, that the beneficiaries of this security fund were entitled to its proceeds as against one who merely stood in the shoes of the contractor. The controversy involved arose in 1893. It is stated in the opinion that it was necessary for the United States to assume the protection of labor and materialmen in order that dishonest and reckless contractors, who did not intend to pay such claims, might not obtain contracts, and thus subject Congress to importunities to make good the resulting loss. It may fairly be assumed, we think, that there was some general recognition of this moral or ethical duty resting upon the United States, and that this led to the passage of the bonding act of 1894. The policy of the act may be thought of in two ways. It may have been the congressional intent to substitute this statutory bond, as a protection to laborers and materialmen, in place of the rather vague obligation, which had been to some degree assumed by the United States, to look after their interests, in which case this obligation was eliminated, and after the statute, there was no such duty resting on the United States and no such right to protection remaining in the laborers. . It may have been the congressional intent to give to these claimants, by this bond, an additional protection, which would become the ordinary and primary one, and usually would be sufficient, and to do this without diminishing the obligation of the government to see that these claims were paid, as far as that result could be accomplished by the funds which it retained. In that event the equitable priority of such claimants in the fund, if such priority there had been, would remain and could be enforced in the appropriate cases either directly or by subrogation.

It is not necessary to consider which of these views would seem the better one, if the question were open. We think it has been foreclosed by the decision of the Supreme Court in Henningsen v. U. S., 208 U. S. 404, 28 Sup. Ct. 389, 52 L. Ed. 547. In that case, the surety upon a bond of this kind, given pursuant to the 1894 statute, and who had been compelled to pay its surety obligation, was held entitled to priority in the retained fund as against a general creditor of the contractor. The case was essentially different from the Prairie State Bank Case, because there the surety had taken over and completed the contract and the performance of the contractor's obligation to the United States as the other party to the contract, and so had become entitled to the security which the United States held against the contractor; in the Henningsen Case, the contractor himself had completely performed the contract and had finished the work. · It would seem, therefore, that subrogation in the Henningsen Case could not be to any security which the United States held against the contractor; there was no such element in the case. The surety's claim of priority in the fund was sustained, and this was done on the stated theory of subrogation. Since there cannot be the transfer of a right by subrogation, unless there is

a right to be transferred, we think the necessary effect of the decision is to hold that the laborers and materialmen, in spite of or in addition to the giving of the bond, had an original and continuing equitable priority in the fund, and that it was this right to which the surety was subrogated. This is not stated in the opinion in very express terms, but it had been pressed upon the court (208 U. S. 407, 408, 28 Sup. Ct. 389, 52 L. Ed. 547) that there could be no such subrogation without such a right, and that there was no such right. On page 410, of 208 U. S., on page 391 of 28 Sup. Ct. (52 L. Ed. 547), the court refers to and assumes that the government, after the bond was given was still charged with "equitable obligations to see that the laborers and supply men were paid." We are constrained to think that the decision necessarily rests upon the existence of this right, as one entitling these claimants to priority in payment out of the fund, and therefore as entitling the surety, as their equitable assignee by subrogation, to the same priority.

If this is the true principle of the decision, it may not be clear what the rights of the parties would be in the various situations that might arise, e. g., as between a surety who had performed the contract and claimants of this class unpaid when the surety took it over, or as between a surety who had paid claims of this class to the limit of his bond and the unpaid remainder of the same class; but those questions can be met when they arise. The same result was reached in Re McGarry (C. C. A. 7) 240 Fed. 400, 153 C. C. A. 326, and in Cox v. New England Co. (C. C. A. 8) 247 Fed. 955, 160 C. C. A. 655. The opinions in these cases do not decide the controlling question—what the right of the laborers and materialmen in the fund is—but they assume that it is decided in the Henningsen Case. In Re Schofield (C. C. A. 2) 215 Fed. 45, 48–50, 131 C. C. A. 353, the precise question is discussed, but seems to be left undecided. The court follows the Henningsen Case, but assumes that it was the same in principle as in the Prairie State Bank Case, not observing what, with all deference, we think the essential distinction already pointed out. When the surety in the latter case stepped in, the United States was the obligee in an unperformed contract, holding security for its performance, and the surety was subrogated. When Henningsen's surety paid up, the United States, the secured creditor, had been satisfied, and had no further claim on the fund, unless it bore the duty to devote the fund to the labor and material claimants; hence the latter proposition must be considered as affirmed. Obviously, the retained fund is devoted to the payment for such labor and material as may be necessary to finish the work after the contractor defaults. Whether it is devoted to pay the contractor's debts of that class is a distinct question, and the cited cases suggest to us some confusion of thought on this subject.

In reaching the conclusion to which the Henningsen Case leads us —that the statute leaves unimpaired an existing obligation by the United States to protect such claimants—we get no help from the fact that the bond which is executed runs to the United States as the nominal obligee. The provisions of the act of 1894 as to bringing suits

show that this is rather a convenience to the claimants than a recognition of any duty by the United States to protect them.

[4] The printed record does not contain the contract and bond at length. Copies were filed, as exhibits, with the bill of complaint, but not included in the transcript. Appellant has caused the copies so filed to be certified to this court, and asks that they be included in the record. We see no objection to this, and it will be ordered that they be' so included, but that they need not be printed. We observe nothing in the contract itself which would seem relevant to the issue we have discussed, excepting the several paragraphs which prescribe the various obligations assumed by the contractor to the United States, for breach of which the United States would have a remedy upon the bond, and paragraphs 9 and 12, which say, respectively:

"9. The contractor shall be responsible for and pay all liabilities incurred in the prosecution of the work for labor and material;" and

"12. Payments shall be made to the contractor as prescribed in paragraph 20 of the specifications hereto attached and forming part of this agreement."

The introductory part of the contract says that it is "in conformity with the advertisement and specifications hereto attached which form a part of this contract." In the copies filed as exhibits with the bill, the advertisement and specifications were not included. Appellant produced at the hearing a copy of such advertisement and specifications, certified by the War Department, and asked that it also be included in the record. We do not clearly see how we can thus bring in a paper which was never presented to the court below, but, as its authenticity does not seem to be questioned, and in order that we might not overlook something inconsistent with the result which we have reached, we have examined this additional paper. We find nothing in it which, as it seems to us, could be thought to bear on the question, save the part which is copied in the margin.[1] Undoubtedly the express provisions in the contract and specification, that the contractor shall pay labor and material claims, and that, when the work is finished, the retained percentage shall be paid to the contractor, look away from, rather than toward, the existence of any remaining obligation by the United States to give such claims priority; but it is to be supposed that these are the common provisions of such contracts, and, indeed, they only express what would be natural implications. On the other hand, we note that the contractor's express promise, in paragraph 9, to pay for material and labor, is a promise to the United States, and is

[1] "20. *Payments.* When funds are available, payments will be made monthly on estimates of work accepted. Ten per cent. will be reserved from each payment until the amount so reserved shall equal $75,000. Upon completion and acceptance of the entire work, all reserved payments will be paid to the contractor. Should payments be discontinued for a period of one year, owing to a lack of funds, one-half of the reserved percentage will be paid to the contractor, it being understood that such payment shall in no manner release the contractor from his obligations under this contract, and that the contract and the accompanying bond shall remain in full force and effect the same as if such reserved percentage had not been paid. When work is resumed, 10 per cent. will be deducted from each monthly payment as before until the total amount reserved again equals $75,000."

secured by the conditions of the bond for "faithful performance," in which the United States has a direct interest. On the whole, we do not think these contract provisions sufficient to require a departure from the rule which we would otherwise follow.

The Henningsen Case was decided under the statute of 1894, and substantial changes were made in 1905, but they do not affect the principle of that case. The chief change is to give the United States priority in the full satisfaction of all its claims under the bond, for completion of the contract or for delay, before the labor and material claimants get their protection. This indicates a less tender care for the interests of such claimants, but we do not see that it affects the question of the underlying obligation of the government to give this protection, in so far as it can be given consistently with the government's priority.

We therefore conclude that the labor and material claimants are entitled to priority in the distribution of the fund in the receiver's hands, as against other creditors. Our order will be that the decree be reversed, with costs, and that the case be remanded, in order that the claimants may recast their pleadings, so as to be in form either an intervention in the receivership case, or an independent bill expressly ancillary to that case, as they may be advised, and that thereafter further proceedings be had in accordance with this opinion.