## ROYAL INDEMNITY CO. v. UNITED STATES.
### No. 48690.

United States Court of Claims.
Nov. 7, 1950.

P. J. J. Nicolaïdes, Washington, D. C. (William F. Kelly, Washington, D. C., on the brief), for the plaintiff.

Edward F. Colladay, Washington, D. C. (Hugo A. Steinmeyer and John E. Walter, Los Angeles, Cal., on the brief), for intervenor.

William A. Stern, II, Washington, D. C., and H. G. Morrison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

On March 19, 1945, the co-partnership of W. A. Foote and W. J. Russell entered into a contract with the United States for the construction of a certain fire alarm sprinkler supervisory system at the Tooele

Ordnance Depot near Tooele, Utah, the total price of which, as modified, amounted to $15,305.00. Article 16 of this contract contains the customary provision that monthly partial payments will be made to the contractor based upon estimates made and approved by the local contracting officer, considering work completed and value of materials delivered on the site. Article 16 further provides that in computing partial payments, 10% of the amount of the approved estimates payable until the work is at least one-half accomplished shall be retained until final completion and acceptance of the project or some severable part thereof (Finding No. 2).

As required by the Miller Act, 40 U.S.C.A. § 270a, c. 642 § 1, 49 Stat. 793, the contractor, on the date of the contract, furnished two bonds, each in the penal sum of $5,411.74. One of these bonds was to secure the performance of the contract; the other was to secure payment to all persons supplying labor and materials in the prosecution of the work provided for in said contract. Plaintiff, Royal Indemnity Company (hereinafter referred to as "surety") became surety upon these bonds.

As part of the consideration for the required bonds, Foote & Russell assigned to the surety, among other claims, "all the deferred payments and retained percentages, and any and all moneys and properties that may be due and payable at the time of such breach or default, or that may thereafter become due and payable to said undersigned on account of said contract, or on account of extra work and materials supplied in connection therewith, hereby agreeing that all such moneys, and the proceeds of such payments and properties, shall be the sole property of the said Royal Indemnity Company, and to be by it credited upon any loan, cost, damage, charge, and expense sustained, or incurred by it as above under its bond of suretyship."

On May 7, 1945, the contractor, by W. J. Russell, executed and delivered to the intervenor, Bank of America National Trust and Savings Association (hereinafter referred to as the "bank") an assignment of all claims against the United States to arise from the before-mentioned contract. This assignment was given for the purpose of securing financing for the project and complied in all respects with the Assignment of Claims Act of 1940, 31 U.S.C.A. § 203, c. 779, § 1, 54 Stat. 1029. The surety was notified of this assignment, as required by the Act, and acknowledged receipt of notification " * * * with full reservation of our contractual rights and any and all rights we have in law or equity as surety * * *."

On May 12, 1945, Foote sold out to Russell and transferred all right, title, and interest in the partnership business and assets to Russell, who assumed all existing liabilities. The surety was notified of this transaction.

On September 5, 1945, the bank made its first loan to Russell, relying for security upon the assignment of his claim under the Government contract here in question and crediting the proceeds of the loan to Russell's checking account. Further similarly secured loans in varying amounts were made in May, August, and September, 1946, the last to cover an overdraft in Russell's checking account. There is no substantial evidence that proceeds from the various loans credited to Russell's account were actually used to finance the Tooele project alone and were not dissipated by Russell along other lines of endeavor. There is no evidence that the loan funds were not used entirely in the Tooele project.

The bank has received, under its assignment, a draft from the Government in the amount of $2,533.12, which, applied against the contractor's total indebtedness, leaves still owing the bank $2,215.49, plus interest at 5% from November 18, 1946.

On January 3, 1947, after having completed 99% of the contract, the contractor was held to be in default, and the Government stepped in and completed the necessary work. After deducting the cost of completion from the funds remaining in its hands, the United States still holds $1,223.85 admittedly due upon the contract.

The contractor left unpaid various laborers and suppliers, and the surety became liable to them under its bond and was forced

894

to pay out $2,276.02 to creditors of the contractor, of which amount none has ever been refunded or paid to the surety by the contractor or anyone else.

The plaintiff here is the surety, which seeks to recover from the United States the amount held by it and admittedly due upon the contract. The bank has intervened and claims the same amount under its assignment from the contractor. The United States, nominally the defendant, considers itself merely a stakeholder.

The question before this court is whether the assignment to the surety or that to the bank should prevail with respect to unexpended funds in the hands of the United States.

■ Examining the transaction chronologically, it readily appears that the first step pertinent here was the consummation of the contract to build between Russell & Foote and the United States. An inseparable part of that transaction was the posting of bonds for performance and for payment of laborers and suppliers. Whatever rights the surety may have growing out of its liability upon these bonds attached from the date of the contract. Prairie State Bank v. United States, 1896, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412.

■ A part of the consideration for the issuance of the required performance and payment bonds was an assignment by the contractor to the surety of the contractor's rights in and to all deferred payments, retained percentages and all moneys and property that might be due and payable to the contractor at the time of any breach or default or that might thereafter become due and payable. This assignment was not within the terms of the Assignment of Claims Act of 1940, supra, inasmuch as that Act provides that a valid assignment may be made only to a bank, trust company, or other financing institution; which the surety admittedly is not. This assignment falls, then, within the scope of Rev. Stat. § 3477, 31 U.S.C.A. § 203, c. 206, 35 Stat. 411, which provides, in effect, that an assignment of the type here in question "shall be absolutely null and void". The effect of this statute is not, however, to regulate the business transactions of private individuals, but to prevent frauds upon the Treasury. Buffalo Bayou B. & C. R. Co. v. United States, 1880, 16 Ct.Cl. 238. Although such an assignment is, by force of the statute, void as against the United States, it is enforceable between the parties, and the courts will recognize equities created thereby. Prairie State Bank v. United States, supra.

■ Payment and performance bonds are required by the Miller Act of all Government contractors. The bank is charged with knowledge of this law. It took its assignment and advanced its money after the contract had been entered into between the contractor and the United States. It is apparent that the bank knew of the surety's interest in the transaction or was, at the very least, put upon notice as to the possibility of an equity possessed by the surety in the proceeds of the contract. The contract between the contractor and the surety clearly created in the surety an equity in any proceeds of the contract. This equity could be dissolved only when the contractor had met all the obligations secured by the bonds.

The contractor's assignment on May 7, 1945, of all his claims under the contract to the bank as security for credit to be advanced and used for the financing of the contract work complied in every respect with the Assignment of Claims Act of 1940, supra. The bank thus took good legal title to the contract proceeds. The question as to whether it took its legal title subject to the equity of the surety is crucial to final determination of the rights of the parties and necessitates an examination of the effect of the Assignment of Claims Act of 1940, upon the assignment of an unliquidated contract claim against the United Stated.

It is strongly urged by counsel for the bank that the 1940 amendment to the Assignment of Claims Act makes it lawful for a contractor to make but *one* assignment of all proceeds resulting from its contract. It is said that when that assignment is completed, including acceptance by the Government, the assignee under that assignment is alone entitled to funds in the Government's possession and that the assign-

ment is made valid by the words of the statute notwithstanding any laws to the contrary. The decision in Coconut Grove Exchange Bank v. New Amsterdam Casualty Company, 5 Cir., 1945, 149 F.2d 73 supports this position.

The Coconut Grove Bank case is necessarily based upon the assumption that the Assignment of Claims Act of 1940 provides for the assignment of the *contract fund* rather than for the more modest result of removing the bans set up by Rev.Stat. §§ 3477 and 3737, 31 U.S.C.A. § 203, 41 U.S. C.A. § 15 against the assignment of *claims* against the United States arising out of contracts. The logical outcome of this assumption could result in a situation where a contractor might assign away the proceeds of a contract in exchange for bank loans, dissipate the loans, render the surety company liable upon its bonds, and then bow out. The bank would then take the proceeds free from all equities, the surety would foot the bill and have only a worthless cause of action against the contractor. In such a situation, had there been no assignment, the contractor would clearly have been liable to the surety company and would have had to make good outstanding claims before claiming any proceeds for himself. Under the doctrine of the Coconut Grove Bank case supra, by an assignment under the Assignment of Claims Act of 1940, supra, the bank would thus be placed in the enviable position of taking the proceeds of the contract free from obligations incidental thereto.

■ . It is generally recognized that the 1940 amendment to the Assignment of Claims Act was enacted to facilitate the financing of war contracts. But it does not appear to this court that the Congress intended to go as far as the Coconut Grove case would indicate in protecting lending institutions.

■ It has been the holding of this court that an assignee under the 1940 Act acquires no greater right in respect to amounts due under the contract than its assignor (the contractor) had and that the right of the assignee to demand payment by the Government of an amount due from it for work performed under the contract was subject to performance by the contractor of his contractual obligations. Hardin County Savings Bank v. United States, 1944, 65 F.Supp. 1017, 106 Ct.Cl. 577; Modern Industrial Bank v. United States, 1944, 101 Ct.Cl. 808.

The bank contends that the provision in the 1940 Act that, "Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this paragraph and the following paragraph shall constitute a valid assignment for all purposes" has the effect of making the assignment to it by the contractor the *only* allowable claim against the Government, superior to the claims of suppliers, laborers, or surety.

■ "Notwithstanding any law to the contrary" is a strong phrase and, read out of context, seems to support the above position. The next phrase, however, is "governing the validity of assignments". Taken together, as they must be, the statute reads, "Notwithstanding any law to the contrary *governing the validity of assignments* [italics supplied], any assignment pursuant to this paragraph and the following paragraph shall constitute a valid assignment for all purposes." What was the law in 1940 *governing the validity of assignments of claims against the United States?* It was the law expressed in Rev.Stat. §§ 3477 and 3737 to the effect that any assignment of an unliquidated claim against the United States should be null and void. The 1940 Act recites its purpose to be "To assist in the national-defense program by amending sections 3477 and 3737 of the Revised Statutes to permit the assignment of claims under public contracts." It was *these* statutory provisions that the Congress referred to in the phrase, "Notwithstanding any law to the contrary governing the validity of assignments". The long-established principle that an assignee with notice of a prior equity takes only the interest of the assignor was not legislated away by the 1940 Act. The purpose and effect of the 1940 Act was to make a contract claim against the United States assignable before maturity to some single financial institution for the purpose of securing

credit; nothing more. No other view would seem compatible with the wording and history of the Act and with expressions of Members of Congress who enacted it into law.

The intervening bank, which took the legal assignment with knowledge of the surety's prior equity and lent money on the faith thereof stands now in the exact position that would have been occupied by the contractor had there been no assignment and were the contractor himself now before this court.

The Miller Act, supra, requires two bonds of those undertaking Government contracts. One is the performance bond; the other a guaranty that laborers and materialmen will be paid. Government contracts commonly provide for periodic progress payments and for certain withholdings (usually 10% on the first one-half of payments made, if progress is satisfactory) until the project or some divisible part thereof is completed and accepted for use. The contract here in question is of this type.

It has been this court's holdings that retained percentages are designed to protect the United States should it be forced to complete a defaulted contract at more than the contract price; that should a surety step in and complete the contract under its performance bond, it becomes subrogated to the Government's claim against the retained percentages; and that the surety who has been obliged to make good the default of the contractor or to respond therefor in damages, has a claim upon funds in the Government's hands superior to that of any other assignee. Hardin County Savings Bank v. United States, supra. See also Prairie State National Bank v. United States, supra.

The cases distinguish between the above-mentioned performance bonds and payment bonds designed to protect laborers and materialmen. "If the contractor fails or refuses to pay its laborers and materialmen, the Government is not liable therefor, and it is not obligated or authorized to use the retained amounts to pay them. Therefore, the surety, upon payment of them, acquires no equitable lien on the retained amount,

since it was not retained to secure performance of the obligation the surety discharges." Schmoll v. United States, 1946, 63 F.Supp. 753, 757, 105 Ct.Cl. 415, 455. See also, United States v. Munsey Trust Company, 1947, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022. The Schmoll and Munsey cases deny the existence of an equitable lien by subrogation in favor of sureties who have paid laborers and materialmen under the obligation of their (sureties') bonds, where the United States both holds the money and is a claimant adverse to the surety. Both cases are bottomed upon the proposition that there can be no subrogation without a right and that the laborers and materialmen never possessed a right against the United States.

Superficially, these cases seem to indicate that the Acts of Congress requiring Government contractors to furnish bond protection for laborers and suppliers create an *exclusive* remedy for such claimants by eliminating the possibility of a laborer or supplier acquiring an equitable lien against funds held by the United States. That position is not novel; it antedates the Schmoll and Munsey cases some thirty years, at least, having been specifically recognized, analyzed, and clarified in 1921 by the Circuit Court of Appeals for the Sixth Circuit in Belknap Hardware & Mfg. Co. v. Ohio River C. Co., 271 F. 144.

The Belknap case dealt with the policy of the various Bonding Acts (of which the Miller Act is the latest refinement) and their effect upon the rights of laborers and materialmen in funds earned by contractors in default and held by the Government. The case involved proceeds from a Government contract, the claim of a surety who had paid laborers and materialmen under its (the surety's) bond, and the conflicting claims of general creditors. The court, relying on and amplifying the Supreme Court's decision in Henningsen v. United States F. & G. Co., 1908, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, accepted the proposition that the laborers and the materialmen had no equitable lien against funds in the Government's hands, but held that there did exist in the laborers and materialmen an "equitable priority" entitling them to preferential pay-

ment from funds in the hands of a *mere stakeholder*. The Circuit Court held that there was subrogation to such equitable priority, saying in part:

"It may have been the congressional intent to substitute this statutory bond, as a protection to laborers and materialmen, in place of the rather vague obligation, which had been to some degree assumed by the United States, to look after their interests, in which case this obligation was eliminated, and after the statute, there was no such duty resting on the United States and no such right to protection remaining in the laborers. It may have been the congressional intent to give to these claimants, by this bond, an additional protection, which would become the ordinary and primary one, and usually would be sufficient, and to do this without diminishing the obligation of the government to see that these claims were paid, as far as that result could be accomplished by the funds which it retained. In that event the equitable priority of such claimants in the fund, if such priority there had been, would remain and could be enforced in the appropriate cases either directly or by subrogation.

"It is not necessary to consider which of these views would seem the better one, if the question were open. We think it has been foreclosed by the decision of the Supreme Court in Henningsen v. U. S. [F. & G. Co.] [citation omitted]. In that case, the surety upon a bond of this kind [payment of laborers and materialmen], given pursuant to the 1894 statute, and who had been compelled to pay its surety obligation, was held entitled to priority in the retained fund as against a general creditor of the contractor. The case was essentially different from the Prairie State Bank Case, because there the surety had taken over and completed the contract and the performance of the contractor's obligation to the United States as the other party to the contract, and so had become entitled to the security which the United States held against the contrac-

tor; in the Henningsen Case, the contractor himself had completely performed the contract and had finished the work.[1] It would seem, therefore, that subrogation in the Henningsen Case could not be to any security which the United States held against the contractor; there was no such element in the case. The surety's claim of priority in the fund was sustained, and this was done on the stated theory of subrogation. Since there cannot be the transfer of a right by subrogation, unless there is a right to be transferred,[2] we think the necessary effect of the decision is to hold that the laborers and materialmen, in spite of or in addition to the giving of the bond, had an original and continuing equitable priority in the fund, and that it was this right to which the surety was subrogated. This is not stated in the opinion in very express terms, but it had been pressed upon the court (208 U.S. 407, 408, 28 S.Ct. 389, 52 L.Ed. 547) that there could be no such subrogation without such a right, and that there was no such right. On page 410, of 208 U.S., on page 391 of 28 S.Ct. (52 L.Ed. 547), the court refers to and assumes that the government, after the bond was given was still charged with 'equitable obligations to see that the laborers and supply men were paid.' We are constrained to think that the decision necessarily rests upon the existence of this right, as one entitling these claimants to priority in payment out of the fund, and therefore as entitling the surety, as their equitable assignee by subrogation, to the same priority."

If the Henningsen and Belknap cases remain law, the equity of the surety prevails here. The holding of the recently decided Schmoll and Munsey cases, both supra, are not in conflict with the holdings of the earlier Henningsen and Belknap cases in relation to the facts at bar. The distinguishing characteristic of the Schmoll and Munsey cases is that both involved the right of the Government to set off its claims arising independently of the contract

1. In the case at bar, the Government stepped in and finished the work; but it has compensated itself out of the funds in its hands, and the end result is the same as if the contractor alone had completed the project, but had left unpaid laborers and suppliers.

2. Cf. Munsey Trust Co. v. United States, supra.

against a surety who had paid laborers and materialmen and claimed an equitable lien against funds in the Government's hands. This feature is recognized expressly in Justice Jackson's Munsey opinion, 332 U.S. 234, 240, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022. "From Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, to American Surety Company v. Sampsell, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663, we have recognized the peculiarly equitable claim of those responsible for the physical completion of building contracts to be paid from available moneys ahead of others whose claims come from the advance of money. *But in all those cases, the owner was a mere stakeholder and had no rights of its own to assert.*" [Italics supplied.]

At pages 243 and 244 of 332 U.S., 67 S.Ct. at page 1604 of the same opinion, it is stated that:

"It [the surety] argues that the implication of the several contracts among government, contractor and surety was that the moneys earned under the repair contracts would be available to pay claims arising under each job. However, if statute did not require a surety, there could be no question that the government would have the right of set-off. Respondent's contention then comes to this: that by requiring the contractor to furnish assurances that he will perform his obligations to laborers and materialmen, the government has deliberately decreased the ordinary safeguards it would have had to enforce the contractor's obligations to it. We see nothing in the words of the contract or the statute to lead us to this conclusion. On the contrary, the statutory provisions requiring a separate bond for payment of laborers and materialmen were enacted for their benefit, not to the detriment of the government. It is the surety who is required to take risk. We have no warrant to increase risks of the government."

As far as may be ascertained, the impact of the Munsey case (and the basis of the Munsey case is the same as that of the Schmoll case) upon prior Supreme Court holdings has been analyzed in but two subsequent decisions.

In United States Fidelity & Guaranty Co. v. Triborough Bridge Authority, 1947, 297 N.Y. 31, 74 N.E.2d 226, 227, the Court of Appeals of New York considered the claim of a surety which had been compelled to pay under its bond the claims of laborers and suppliers and the conflicting claim of the United States based upon income taxes owed by the contractor to earned funds in the hands of the Bridge Authority which had let the contract. After concluding the law to be settled that the surety's rights were superior to those of the United States (who, as intervenor asserting a tax claim against the contractor stood in the shoes of the contractor), the court addressed itself to the effect of the Munsey case:

"The Supreme Court's recent decision in United States v. Munsey Trust Co., [citation omitted] neither reaches nor points a contrary result. There, the Government, itself in possession of the fund, asserted a claim of its own by way of set-off and, to the extent of that set-off, the fund upon which the surety's lien could operate was necessarily reduced. Quite different is such a case from one like the present—as the Supreme Court observed—where [quoting from the Munsey case] "the owner was a mere stakeholder and had no rights of its own to assert."

In the federal courts, a like result was reached by Chief Judge Coleman of the United States District Court for the District of Maryland. In re Cummins Const. Corporation, 1948, 81 F.Supp. 193, 200. Referring to the language of Justice Jackson in the Munsey case (quoted above) that court said:

"We find nothing in this language which is to be taken as changing the prior settled law with respect to the status of a surety under circumstances such as those before us. Indeed, the Court in the Munsey case directly affirms earlier decisions in this respect where, as in the present case, the Government 'was a mere stakeholder and had no rights of its own to assert.' "

█ It appears that these are correct interpretations of the Munsey case. Had the Court there intended to overrule the

long line of cases grounded on Prairie State Bank v. United States and Henningsen v. United States Fidelity & Guaranty Co., both supra, it is reasonable to assume that they would have been more specifically referred to and discussed. Rather, they are inferentially reaffirmed where applicable facts exist, and the Munsey decision limited to its own peculiar facts where the Government's interest is more than that of a stakeholder. The Schmoll case, supra, is similarly limited. The case of Seaboard Surety Co. v. United States, 1946, 67 F.Supp. 969, 107 Ct.Cl. 34, turns on the statutory right of the United States as an intervening creditor under Rev.Stat. § 3466, 31 U.S.C.A. § 191 and is likewise limited to its facts.

Reduced to its simplest terms, the case at bar is this: The equity of the surety company arose at the time of the giving of the bond. The bank took its assignment with knowledge of and subject to the equity of the surety. The Assignment of Claims Act of 1940, did not cut off this equity. The right of the surety to assert its equity became available when it was forced to pay under its bond. The United States is a mere stakeholder and must pay to the claimant with the superior right. The claim of the surety to the contract proceeds up to the amount of its loss under its bond obligation is superior to that of the contractor whose default had caused the loss. The bank stands in no better position than the contractor (its assignor). The surety's equity should be satisfied before payment by the stakeholder (the United States) is made to the bank under the assignment. Inasmuch as the United States holds insufficient funds to satisfy the surety alone, judgment for the entire amount held by the United States and due on this contract will be for the surety.

Accordingly, judgment is hereby rendered in favor of the plaintiff for the sum of $1,233.85.

It is so ordered.

WHITAKER AND LITTLETON, JJ., concur.

MADDEN, Judge, dissenting.

I am unable to agree with the opinion of the court. I think that the Assignment of Claims Act, 54 Stat. 1029, 31 U.S.C.A. § 203, had the effect of giving to the intervenor, the Bank of America, the primary legal right to money owed by the United States to the contractor under the contract here involved. That legal right, like any other, might be subject to superior equities, such as the right of the United States, the debtor, to set off debts due to it from the contractor. United States v. Munsey Trust Company, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed 2022. Schmoll v. United States, 63 F.Supp. 753, 105 Ct.Cl. 415. But if the assignment authorized by this recent legislation is to be of real use in enabling contractors to obtain financing for the performance of Government contracts, the legal right of the money-lending institution should be subjected only to such asserted equities as are clear and meritorious. In this case I think the asserted equity of subrogation of the plaintiff surety has little merit. I do not feel at all sure that it is out of pocket a penny by reason of the events which occurred.

The bank loaned money to the contractor for the construction, labor, and material costs incurred in the performance of the contract in question. Such evidence as is available indicates that the contractor used the borrowed money for that purpose, and, in the absence of any evidence to the contrary, I think the court should so find. The use of the borrowed money for this purpose, then, reduced dollar for dollar, the bills for labor and materials which the surety would have been obliged to pay if the contractor had not paid them with the money borrowed from the bank. The contractor did not pay all of its bills for labor and material, and the surety had to pay the remaining ones. But if it also gets the funds still held by the United States, and covered by the contractor's assignment to the bank, it will have been relieved of the risk of its surety obligation, largely with the bank's money. I see no equity in that result. And I see a substantial frustration of the purpose of the Assignment of Claims Act. I would

hold that the intervenor is entitled to the money which is in the Government's hands. What I have written is in substantial agreement with the decision in Coconut Grove Exchange Bank v. New Amsterdam Casualty Company, 5 Cir.1945, 149 F.2d 73.

Chief Judge Jones agrees with this dissent.