**AMERICAN FIDELITY COMPANY, a corporation, and New Hampshire Fire Insurance Company, a corporation, Appellants,**

v.

**NATIONAL CITY BANK OF EVANS-VILLE, a corporation, Appellee.**

**Nos. 14831, 14832.**

United States Court of Appeals District of Columbia Circuit.

Argued March 17, 1959.

Decided May 12, 1959.

Mr. Alexander M. Heron, Washington, D. C., with whom Mr. Preston C. King, Jr., Washington, D. C., was on the brief, for appellants.

Mr. O. R. McGuire, Jr., Washington, D. C., with whom Mr. John J. Ross, Washington, D. C., was on the brief, for appellee.

Before Mr. Justice BURTON, retired,* and WILBUR K. MILLER and BAZELON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The principal question presented here may be stated thus: When a contractor borrows money from a bank and as security therefor legally assigns the proceeds of its Government construction contract and the bank as assignee receives progress payments thereunder, may the sureties on the contractor's performance and payment bonds recover such payments from the bank to reimburse them for sums paid by them because the contractor defaulted after the bank had collected the progress payments?

Other questions are whether the proceeds of the bank loans of the contractor in this case were diverted from the performance of the contract and, if so, whether the diversion caused the bank to lose its right, if any, to retain the payments which as assignee it received from the Government. These and additional minor questions arise from the facts now stated.

The Regent Contracting Company, a corporation, entered into a contract with the United States January 15, 1954,[1] to construct a steam generating plant at Oceana, Virginia, for a consideration finally fixed at $350,423.[2] Pursuant to

40 U.S.C.A. § 270a, it executed performance and payment bonds in the penal sums of $338,000 and $169,000 respectively. American Fidelity Company and New Hampshire Fire Insurance Company became sureties on these obligations.

On February 12 the corporation, joined by its three stockholders, executed a loan agreement to The National City Bank of Evansville. It represented that it would use the proceeds of loans in the performance of the Government contract mentioned above, that it was ready, willing and able to assign to the bank as security all payments to become due under the contract, and that it would obtain a subordination agreement from the sureties.[3] On the same day, the bank lent the corporation $75,000 and took from it an assignment of the payments on the contract as authorized by the Assignment of Claims Act, 31 U.S.C.A. § 203 and 41 U.S.C.A. § 15. Notice of the assignment was given by the bank March 16 to the Government and the sureties. The latter acknowledged receipt of notice "without prejudice to any and all rights and with reservation thereof." On April 27 the bank made the corporation an additional loan of $84,000.

The United States made three progress payments to the assignee bank: $34,461.90 on March 31; $23,022.54 on May 21; and $37,854.90 on July 2. Of these payments the first two were by agreement credited to the Regent partnership, and the third was applied to the corporation's notes. There was also credited on the corporation's notes, by agreement of the partnership, the sum of $31,614.48 paid by the Government

* Sitting by designation pursuant to Sec. 294(a), Title 28 U.S.Code.

1. All dates herein mentioned are in the year 1954 except when indicated otherwise.

2. Three individuals, who as partners doing business under the name of Regent Contracting Company were performing other construction projects for the Govern-

ment aggregating $2,970,000, apparently organized the corporation of the same name to enter into the steam generating plant contract. They were the officers and sole directors and stockholders of the corporation. It had no other contract.

3. A subordination agreement was never obtained.

on account of a construction contract being performed by the partnership.[4]

On April 27, the same day the bank made the $84,000 loan, American Fidelity's Washington attorney addressed a letter to the bank, advising that indebtedness had accrued for labor and material which it expected to be called on to pay, and claiming "equitable rights in the contract proceeds superior to the assignment which has been given to you by the contractor." [5]

The United States, because of the corporation's default, terminated the contract July 22. At that time the Government had already made the three progress payments to the appellee bank mentioned above, and had retained $10,593.26 pending satisfactory completion; and the corporation had performed work worth $13,520 for which no payment had been made. Following default, the United States had the work completed by another at a cost, which, after the application of the retained percentages and the value of the work not theretofore paid for, amounted to $5,916.34 more than the contract price, which the sureties paid. They also paid under the payment bond $109,529.81 to suppliers of labor and material whom the contractor left unpaid; these payments were made by the sureties some time after the Government had paid to the assignee bank the three sums which are in controversy here.

May 11, 1954, the sureties sued in the United States District Court for Maryland, asking exoneration, the appointment of a receiver for the Regent corporation, and other equitable relief. Some months later they filed a supplemental complaint seeking judgment for the amounts they had paid to suppliers of labor and material. On October 18, 1955, they were awarded judgment on that score in the sum of $109,529.81 against the Regent corporation.

In April, 1955, the bank sued the sureties in the United States District Court for the District of Columbia demanding an accounting and seeking to recover the amounts due the corporation at termination, because the Government's retention of those sums had relieved the sureties of liability therefor. On July 1, 1955, the sureties counterclaimed against the bank, praying that (a) an equitable lien in the amount of $109,529.81 be declared in their favor against all proceeds of the contract received by the bank; (b) the bank be ordered to make an accounting; and (c) they have judgment against the bank for $95,319.34, with interest and costs.[6]

The sureties had sued the bank in May, 1955, in the United States District Court for the Southern District of Indiana seeking to recover the three progress payments it had collected. This action was transferred to the District of Columbia and was consolidated with the action by the bank in which the sureties had filed a counterclaim, the parties agreeing that the issues in the counterclaim were the same as those in the Indiana action.

Finally in the consolidated cases, the bank's complaint against the sureties and their counterclaim against the bank were dismissed by the District Court. Judgment for $89,530.52 with interest accrued to December 18, 1957, in the sum of $17,218.85, was awarded to the bank against the Regent Contracting Company, Inc. The sureties appeal. They say the District Court erred in concluding as a matter of law that they could not recover from the bank the three progress payments made to it by the Government under the assignment. They say further the District Court erred in failing to hold that the three progress payments were

---

4. This was not the steam generating plant contract.

5. Of course the letter was not received by the bank at Evansville, Indiana, until a day or two after it had made the loan of $84,000.

6. In their pre-trial statement the sureties said they paid to laborers and materialmen $110,529.81 under the payment bond; and $5,916.34 to the United States for excess cost of completion under the performance bond.

received by the bank impressed with an equitable lien or trust in their favor to the extent they had been forced to pay under the bonds.

■■ When a surety on a Government contractor's performance bond makes a payment thereunder to or for the United States, he is subrogated to the rights of the Government as to any funds due or to become due under the contract. This subrogation, sometimes called an "equitable lien," [7] relates back to the date of the bond, and is therefore superior to any conflicting claim thereafter asserted by another. In like manner when a Government contractor's surety on a payment bond makes a payment thereunder to suppliers of labor or material, he is subrogated to the rights and preferences of such suppliers as to sums due or to become due under the contract; and again the subrogation relates back to the date of the bond.

■ Thus it is seen that a surety has the right to be subrogated, as of the date of his bond, to the rights and preferences of anyone to or for whom he is thereafter required to pay. This right is potential only until the contractor's default causes the surety to pay. It is a shadowy thing until it is given substance by the occurrence of a loss to the surety; theretofore a mere right to subrogation, it then becomes an actuality. And the law gives the surety the added advantage of having subrogation effective as of the date of his original undertaking.

The general principles set forth in the preceding paragraphs may be gleaned from the following cases: Prairie State Nat. Bank of Chicago v. United States, 1896, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Henningsen v. United States Fidelity & Guaranty Co., 1908, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; United States v. Munsey Trust Co., 1947, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022; Richards Brick Co. v. Rothwell, 1901, 18 App.D.C. 516; Lyttle v. National Surety Co., 1915, 43 App.D.C. 136; Exchange State Bank v. Federal Surety Co., 8 Cir., 1928, 28 F.2d 485; Kane v. First Nat. Bank, 5 Cir., 56 F.2d 534, 85 A.L.R. 362, certiorari denied sub nom Kane v. Pottorff, 1932, 287 U.S. 603, 53 S.Ct. 8, 77 L.Ed. 524; Moran v. Guardian Casualty Co., 1935, 64 App.D.C. 188, 76 F.2d 438; Morganthau v. Fidelity & Deposit Co. of Md., 1937, 68 App.D.C. 163, 94 F.2d 632; California Bank v. United States Fidelity & Guaranty Co., 9 Cir., 1942, 129 F.2d 751; Bank of Arizona v. National Surety Corp., 9 Cir., 1956, 237 F.2d 90; Royal Indemnity Co. v. United States, 1950, 93 F.Supp. 891, 117 Ct.Cl. 736; National Surety Corp. v. United States, 1955, 133 F.Supp. 381, 132 Ct.Cl. 724; United States Casualty Co. v. First Nat. Bank, D.C.M.D.Ga.1957, 157 F.Supp. 789.

■ It should be noted that, under the principles just stated, a surety is subrogated to another's right to funds still in the hands of the Government or which it has the right to recover. It remains to determine whether, in the circumstances of this case, the sureties may recover from the bank the payments which as assignee it had been paid by the Government before the contractor's default; that is to say, money no longer in the hands of the United States.

In oral argument, the sureties said they were not basing their claim to the progress payments upon the doctrine of subrogation, but upon their equitable lien. We have already indicated, however, that what some courts have called the equitable lien of a surety is nothing more than a right to be subrogated, to the extent of his payments, to the rights of the contractor, or to the rights of the

7. Cf., e. g., Moran v. Guardian Casualty. Co., 1935, 64 App.D.C. 188, 189, 76 F.2d 438, 439, where it was held that a bank advancing money to a Government contractor is presumed to act with full knowledge of the rights of the surety, which "include a lien in favor of the surety from the date of the execution of the bond, for the surety by the terms of the bond is bound to the payment of all claims growing out of the performance of the contract and this, of itself, creates the *equitable right of subrogation."* (Emphasis supplied.)

Government or other persons to whom he made payments. It becomes essential then to ascertain whether the contractor, the Government, or the mechanics and materialmen, had any right to recover the progress payments from the bank, to which right the sureties could be and were subrogated.

It goes without saying that the contractor, who had for a full consideration assigned to the bank the progress payments here involved, could not recover them from its assignee, so subrogation to the contractor would avail the sureties nothing, and is not claimed by them.

With respect to their payment of $5,916.34 to the United States under the performance bond, the sureties are in a different position than that they occupy because of their payment of $109,529.81 to suppliers of labor and material under the payment bond. This is so because the rights to which they were subrogated differed in nature. As to the payment under the performance bond, the sureties were subrogated to the rights of the United States. It follows that the sureties cannot recover their loss from the assignee bank unless the United States had had the right to recover the progress payments it had made to the bank under the assignment. Whether the Government had such right depends on the validity, nature and result of the assignment, and the effect of payments thereunder.

Under the Anti-assignment Acts as they were before the 1940 amendments,[8] a contractor could not validly assign the payments to become due to him under a Government contract. As a result, many contractors had difficulty in financing their operations; often they could not obtain advances from banks because they could not secure them by lawfully and effectively assigning the payments to be received under the contracts.

In order to obviate this difficulty and so to assist in the national defense program, the Congress enacted what is known as the Assignment of Claims Act of 1940, 54 Stat. 1029, which added to §§ 3477 and 3737 of the Revised Statutes the following paragraph:

"The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: [with additional provisions not relevant here.]"

But the Comptroller General interpreted the Act narrowly and began to rule that payments made to assignees could be recovered by the Government[9] when the assignor was liable to it under or apart from the assigned contract. This again hampered contractors in their financing, so the Congress on May 15, 1951, 65 Stat. 41, amended the Assignment of Claims Act of 1940[10] by striking out some of the provisos and adding provisions which include the following:

"Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to the Assignment of Claims Act of 1940, as amended, shall constitute a valid assignment for all purposes.

"In any case in which moneys due or to become due under any contract are or have been assigned pursuant to this section, no liability of any nature of the assignor to the United

---

8. Sections 3477 and 3737 of the Revised Statutes.

9. And hence by a surety who had been forced to pay to or for the United States. Thus, in effect, an assignee bank became surety for the surety to the extent of its collections.

10. Sections 3477 and 3737 of the Revised Statutes, as amended by the Assignment of Claims Act of 1940 and the 1951 amendment thereto, are now codified as 31 U.S.C.A. § 203 and 41 U.S.C.A. § 15, respectively.

States or any department or agency thereof, whether arising from or independently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund, or repayment to the United States of any amount heretofore since July 1, 1950, or hereafter received under the assignment."

Because of the 1951 amendment to the Assignment of Claims Act, the United States could not recover from the assignee bank the progress payments once it had made them, except for fraud. Even if the payments were erroneously made, the Government could not recover them from the assignee. United States v. Hadden, 6 Cir., 1951, 192 F.2d 327. The surety cannot, therefore, recover from the bank the sum it was required to pay under the performance bond, unless the progress payments to the assignee had been induced by fraud. That there was no fraud is held hereinafter.

With respect to payments made by them under the payment bond, the sureties were subrogated to the rights of the laborers and materialmen whom they paid. But the only rights those persons had were to proceed against the contractor and the surety on the payment bond which the Government had gratuitously required for their protection. They had no right against the United States, which had not agreed to pay them and was under no duty to do so. United States v. Munsey Trust Co., 1947, 332 U.S. 234, 241–242, 67 S.Ct. 1599, 91 L.Ed. 2022. So the sureties obtained nothing by subrogation to the rights of laborers and materialmen except the right to proceed against the contractor. This they did in the Maryland federal court, as we have seen. It is apparent that the mechanics and materialmen never had any legal or equitable rights to the proceeds of the contract and so had no right to recover the progress payments from the assignee bank. Bowers v. Town of Martinsville, 1931, 156 Va. 497, 159 S.E. 196, 200; United States v. Munsey Trust Co., supra; California Bank v. United States Fidelity & Guaranty Co., 9 Cir., 1942, 129 F.2d 751, 753. This is not a case involving the "peculiarly equitable claim" of mechanics and materialmen for preference in the *order of payment* from contract proceeds held by the United States as stakeholder. United States v. Munsey Trust Co., 332 U.S. at page 240, 67 S.Ct. at page 1602.

Since neither the Government, the contractor, nor those who had furnished labor and material could recover from the bank the payments made to it under the assignment, there was no right to or claim against those payments to which the sureties could be subrogated when they responded to the obligations they had undertaken in their bonds.

The sureties say the bank was required to see that the proceeds of its loans went toward performing the contract; that the bank itself diverted the loan proceeds by crediting them, not to the borrowing corporation, but to a partnership of the same name; and that the bank failed to prove that the partnership used the money in the performance of the corporation's contract. From this the sureties apparently reason the bank lost any absolute right it might otherwise have had to retain the Government payments made to it as assignee.

As we have shown, the Regent corporation was owned by three stockholders who, as partners doing business as the Regent Contracting Company, were then engaged in performing Government contracts other than that held by the corporation. At the latter's request, the bank credited the proceeds of the loans in question to the partnership. With respect to this arrangement, the District Court found:

"14. While corporation and partnership funds were deposited in a single bank account, insofar as plaintiff bank was concerned, separate books of account were maintained by the corporation and the partnership from which audits were made and received in evidence. Al-

location of overhead items as between the corporation and the partnership were made under the supervision of a certified public accountant who audited the corporation and partnership affairs monthly."

We are not impressed by the argument that this was a significant diversion. It was as though the bank had credited the loan proceeds to the corporation which then turned the money over to the partnership for convenience in administration. The corporation's request that this be done was tantamount to drawing a check to the partnership for the loan proceeds.

But, the sureties say, it was not proved that the partnership devoted the proceeds to the performance of the corporation's contract. The short answer is that the bank as assignee was not required to look to the application of the loan proceeds. Central Bank v. United States, 1953, 345 U.S. 639, 73 S.Ct. 917, 97 L.Ed. 1312. Until default occurred the bank had a right to trust the contractor, just as the sureties did. The latter could have, but did not, require joint control.

The bank did show, however, that the partnership, whose members were personally liable for the corporation's notes, made substantial payments in the performance of the corporation's contract. In this regard the trial court found:

"27. There is evidence that payments were made by the partnership on behalf of the corporation for some of the labor and material used in the performance of the corporation's contract. The evidence with respect to such payments was not sufficiently definite or satisfactory to support a determination as to their total amount. * * *"

Moreover, we observe that on one occasion the partnership paid from its own funds the sum of $31,614.48 on the corporation's notes.

The sureties' charge that the bank wrongfully diverted the money to the partnership which did not devote it to the corporation's contract was, essentially, a charge of fraud. It was incumbent upon the sureties to sustain that allegation by proof that the partnership did not use the money for the intended purpose. Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 5 Cir., 1945, 149 F.2d 73. They did not do so.

Cases cited by the appellants, such as Henningsen v. United States Fidelity & Guaranty Co., 1908, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; Martin v. National Surety Co., 1934, 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822; Richards Brick Co. v. Rothwell, 1901, 18 App.D.C. 516; Moran v. Guardian Casualty Co., supra; Town of River Junction, Fla. v. Maryland Casualty Co., 5 Cir., 1943, 133 F.2d 57; Royal Indemnity Co. v. United States, 1950, 93 F.Supp. 891, 117 Ct.Cl. 736; National Surety Corp. v. United States, 1955, 133 F.Supp. 381, 132 Ct.Cl. 724; either arose before the enactment of the Assignment of Claims Act of 1940, as amended, or had to do with situations in which the dispute concerned moneys still in the hands of the United States.

Other cases factually more similar to this one, such as McKenzie v. Irving Trust Co., 1945, 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305; Kane v. First Nat. Bank, 5 Cir., 56 F.2d 534, certiorari denied sub nom Kane v. Pottorff, 1932, 287 U.S. 603, 53 S.Ct. 8, 77 L.Ed. 524; General Casualty Co. of America v. Second Nat. Bank, 5 Cir., 1949, 178 F.2d 679; Bank of Arizona v. National Surety Corp., 9 Cir., 1956, 237 F.2d 90; United States Casualty Co. v. First Nat. Bank, D.C.M.D.Ga.1957, 157 F.Supp. 789, and others heretofore cited in this opinion, amply support our conclusions.

We hold the cases were correctly decided by the District Court.

Affirmed.