KENNEDY ELECTRIC CO., INC., a Colorado corporation, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, Defendant and Third-Party Plaintiff,

v.

J. C. CORRIGAN CO., INC., and Corrigan Construction Company, Third-Party Defendants.[1]

Civ. A. No. C–3822.

United States District Court, D. Colorado.

Nov. 30, 1973.

1. The third-party complaint has been dismissed pursuant to stipulation.

Holland & Hart, Robert E. Benson, Denver, Colo., for plaintiff.

James L. Treece, U. S. Atty., Denver, Colo., Hubert H. Margolies, Department of Justice, Washington, D. C.., of counsel, for defendant.

## MEMORANDUM OPINION

WINNER, District Judge.

The United States Postoffice Department, defendant's predecessor, awarded contract No. 70–1–00698 to J. C. Corrigan Co., Inc. The contract was for bulk mail handling facilities in the post office in Milwaukee, Wisconsin. A portion of the work was subcontracted by Corrigan Co., Inc. to Corrigan Construction Company [although the two Corrigans are for all practical purposes a single entity] and Corrigan Company in turn subcontracted part of the work to plaintiff. On May 10, 1971, the contract with Corrigan was terminated, and Corrigan thereafter went bankrupt. July 1, 1971, defendant succeeded the United States Postoffice Department under the provisions of 39 U.S.C. § 401, et seq., and defendant thereupon acquired the assets and assumed the liabilities of the Postoffice Department.

After taking change orders into account, the contract amount was $998,854.47, which, according to the Post-office Department would require a payment bond of $137,103.54, and a performance bond of $244,827.75. These bonds were required under the provisions of the Miller Act [40 U.S.C. § 270a et seq.] and under the provisions of the contract itself. Corrigan failed to file either bond, and the Postoffice Department did nothing about it, and, instead, permitted the job to go forward unbonded. Of course, plaintiff has no mechanic's lien rights, and, knowing of the Miller Act and knowing of the contractual requirement for a bond, plaintiff assumed and relied upon the presumption that the law would be obeyed and, understandably, it assumed that the required bonds had been filed. Defendant now asserts that this was negligence on plaintiff's part; that plaintiff was under a duty to investigate to see if the law had been complied with. I think not. If defendant is correct in this position, countless cases are going to have to be reversed where this approved jury instruction has been given:

"One has the right to assume, in the absence of reasonable grounds to think otherwise, that other persons will obey applicable laws and regulations, and one is not negligent in failing to anticipate that the other persons may violate such laws and regulations."

Kennedy had the right to assume that applicable laws and regulations would be obeyed by a governmental agency, and it was not negligent in failing to anticipate that the bond required by law and by contract would not be filed. Nor, as will be discussed presently, was it negligent in failing to anticipate that the Postoffice Department would disregard and violate its own regulations.

As early as March, 1970, the Postoffice Department knew that Kennedy was a subcontractor and that it was supplying materials under its subcontract. By April, 1970, Corrigan was behind schedule, and the Postoffice Department repeatedly complained about lack of progress. With this expressed concern on the part of the Postoffice Department about the job's progress, it was faced with the provisions of 41 C.F.R. § 1–30.-521:

"For contracts with those contractors . . . who are encountering substantial difficulties in performance, full information concerning both the progress under the contracts involved (*including the status of subcontracts*) and concerning the contractors' other operation and financial condition, should be obtained and analyzed at frequent intervals."

This was not done, but on August 20, 1970, the Department notified Corrigan that it would hold up further progress payments until it was satisfied that Corrigan was making satisfactory progress. But, for some unexplained reason, progress payments were not held up.

On September 10, 1970, the contracting officer did withhold $55,172.00 of an invoiced amount of $255,172, because the contracting officer challenged the progress claimed by Corrigan. November 9, 1970, the Department was advised that all contract payments had been assigned to The First National Bank of Boston.[2] On November 16, 1970, Corrigan submitted an invoice for $292,000, which would have left a balance of only $3,247 to be billed, although it was abundantly clear at that time that the job was not that near completion. This payment was not made, but it surely should have alerted the Postoffice Department to the fact that all was not well with the job if indeed it had not been forewarned much earlier, and it is apparent that a prudent owner would have observed the danger signals well in advance of November 16, 1970.

The contract, of course, permitted normal payments to the contractor of only 70% of the value of the work done, and the Postoffice led Kennedy to believe that payments to Corrigan would be held to this 70% maximum—a representation also made by Corrigan when contacted by Kennedy. Nevertheless, because of Corrigan's pressing financial problems, the Postoffice Department paid $14,500 on February 16, 1971. Even at this late date, no investigation of Corrigan's financial condition was made by the Postoffice despite the provisions of 41 C.F.R. § 1–30.521, supra, and in March, 1971, Kennedy again was assured by the Postoffice that Corrigan's payments would be limited to the 70% figure. With these assurances, with the uncertain condition of the job, and facing 41 C.F.R. § 1–30.519 which requires adequate support for progress payments, on March 24, 1971, the Postoffice Department paid $190,747.00 on an unsupported request. No thought was given to and no investigation was made of the subcontractors' financial condition before this last payment was made, and this advance brought the total payments to $889,311.00. Even if the job were 95% complete on March 24, 1971, and surely it was no more nearly complete than that, the total authorized progress payments would be $664,238.21. [95% × 70% × $998,854.47.] Yet, 41 C.F.R. § 1–30.521 says that "the unliquidated progress payments should not be permitted to exceed the percentage specified in the contract." The actual progress payments exceeded the authorized

---

2. This assignment was not prohibited under the provisions of 31 U.S.C. § 203 in that it is an enumerated exception from that law.

progress payments by $225,072.78, and even if the adjusted contract price contended for by defendant be adopted, the excess payments total $190,113.00.

Recapitulating, after the March 24, 1971, payment, there was an amount of $109,543.47, retained [$998,854.47 less $889,311.00]. The Postoffice said that 5% of the job was yet to be performed. It said it was entitled to liquidated damages, and a claim was made for parts not furnished. In tabular form, these claims were:

| | |
|---|---|
| 5% of contract price | $ 49,943.00 |
| Liquidated damages | 45,000.00 |
| Missing parts | 23,804.00 |
| | $118,747.00 |

By hindsight, defendant says the amount should have been $135,407.30, but using either foresight or hindsight, the Department didn't retain enough to protect its own claims, and this despite the provisions of 41 C.F.R. § 1–30.521, which mandates careful administration to protect against overpayments or losses, and, with the series of misadventures surrounding the Milwaukee Postoffice job, the administration was anything but careful. Certainly, the contract administration missed the mark of 41 C. F.R. § 1–30.521.1, which demands that "particular care must be taken to assure that the unpaid balance of the contract price will be adequate to cover the anticipated cost of completion, or that the contractor has adequate resources to complete the contract."

Returning now to the $190,747.00 payment of March 24, 1971, the regulations do have a procedure for approving unusual progress payments. That procedure is set forth in 41 C.F.R. § 1–3.505, but the procedure wasn't followed in that the mandatory approval of the head of a procuring activity or of a person specially designated for that purpose wasn't obtained,[3] nor was there any compliance with (a) the requirement that a contractor demonstrate his need, (b) the requirement that it be shown that private financing was unavailable, or (c) the requirement of a showing of exceptional circumstances. In fact, this payment of $190,747.00 was made casually as if it were a routine matter requiring only clerical scanning.

41 C.F.R. § 1–30.521.2 says:

"It is expected that the contractor will use progress payments made by the Government, or equivalent amounts of money *to pay the costs incurred in the performance of the contract* under which progress payments are made."

The Postoffice Department knew that Corrigan was in financial trouble; it had reason to know that he had no "equivalent amounts" to draw on to pay the subcontractors; it knew plaintiff had not been paid, and it knew that the unusual excess payment of $190,747.00 was going to the First National Bank of Boston under the assignment. Nothing was done to protect the subcontractor who had no mechanic's lien rights and who had no bond to fall back on, even though a bond was required by statute and by contract. The Postoffice knew that there was but slight chance that much of the $190,747.00 would be used to complete the contract or to pay the subcontractors, and, indeed, with the possible exception of less than $20,000.-00 none of the money was applied to the contract. Just when the Department faced up to the fact that the required bonds had not been filed is somewhat unclear from the record, but it was surely no later than April, 1971, and at that time the Department owed Corrigan $50,000 on other jobs, while Corrigan then estimated the cost of completing the Milwaukee job at $26,500.00. [As of May, the Postoffice Department's estimate for completion was $45,000.00.]

As has been mentioned, the contract was terminated on May 10, 1971, and by that time, total payments to Corrigan and its assignee, the bank, were $889,311.00, with a $61,281.31 balance due plaintiff. [The parties have stipulated to this amount.] After the con-

---

3. See, United States v. Blair, (1944) 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039.

tract's termination, and after defendant had succeeded to the rights and liabilities of the Postoffice Department, $107,698.47, was transferred to defendant under this contract, and it cost $59,103.30 to complete the contract. Thus, the lack of a performance bond cost the Postoffice nothing as matters now stand, (except, possibly, liquidated damages) and it is the subcontractors who are holding the bag. It is apparent that defendant does not hold enough retainage to pay plaintiff's claim unless it be said that it is constructively holding the $190,747.00 paid the bank. Of course, had the Postoffice seen to the filing of the performance bond, that bond would have been available to complete the job.

■■ Without the $190,747.00, there would be only $35,739.47 on hand. This amount is computed:

| Adjusted contract price | | $998,854.47 |
|---|---|---|
| Corrigan payments | $889,311.00 | |
| Missing parts | 23,804.00 | |
| Warranty | 5,000.00 | |
| Labor | 45,000.00 | |
| | 963,115.00 | |
| | $ 35,739.47 [4] | |

———◆———

If plaintiff is entitled to recover, the $35,739.47 is or should be immediately available in defendant's hands to go towards the payment of plaintiff's claim, but if plaintiff is to recover the full amount of its claim, the additional money is going to have to come from somewhere else, and plaintiff argues that the $190,747.00 was subject to an equitable lien in favor of the subcontractors, and that it was constructively held by defendant for their protection.

This contention is the nub of the case which has led to the filing of almost 300 pages of pretrial and post trial briefs, albeit defendant elected to disregard plaintiff's claim of equitable lien until its post trial briefs. Before discussing this most troublesome claim, other less difficult questions must be decided.

The stipulated pretrial order provides:

"The jurisdiction of this Court is based upon 39 U.S.C. § 409(a) and 28 U.S.C. § 1339, and is admitted."

Despite this admission of jurisdiction, defendant belatedly argues that this is a Tucker Act suit, and that jurisdiction is in the Court of Claims. That is not what the statute says. 39 U.S.C. § 409 reads:

"(a) Except as provided in section 3628 of this title [a section not here applicable] the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service. Any action brought in a State court to which the Postal Service is a party may be removed to the appropriate United States district court

.  .  .

"(c) The provisions of chapter 171 and all other provisions of title 28 relating to tort claims shall apply to tort claims arising out of activities of the Postal Service."

■ 39 U.S.C. § 2002 transfers the obligations of the Postoffice Department to the Postal Service, and 39 U.S.C. §

---

4. Liquidated damages are intentionally omitted. Where cost of completion is allowed, liquidated damages are not. United States v. Cunningham (1941) 75 U.S.App.D.C. 95, 125 F.2d 28. Moreover, equity permits subordination of the claim for liquidated damages to the claim of plaintiff. Pepper v. Litton (1939) 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. All of the equities here favor Kennedy, and subordination is in order.

401 says that the Postal Service can sue and be sued. This court has jurisdiction.

Plaintiff initially argues that it is entitled to recover under the Federal Tort Claims Act because of negligence on the part of defendant's predecessor in failing to insure the filing of the payment and performance bonds. Although I think that there was clear negligence on the part of Postoffice Department employees, and although I do not think that there was any contributory negligence on the part of Kennedy, plaintiff's claim under the Federal Tort Claims Act is rejected under the authority of United States v. Neustadt (1961) 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614, and United States v. Smith (1963) 5 Cir., 324 F.2d 622.

Nor does plaintiff have any claim in contract, quasi contract, implied contract or quantum meruit. There is no privity essential to the establishment of a contract claim, and a quantum meruit suit does not lie. United States v. Munsey Trust (1947) 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022; United States v. Smith, supra; Merritt-Chapman Corp. v. United States (1972) 458 F.2d 42, 198 Ct.Cl. 223; Nickel v. Pollia (1950) 10 Cir., 179 F.2d 160, and Fanderlik-Locke Co. v. United States (1960) 10 Cir., 285 F.2d 939.

With these determinations, plaintiff rests on its precarious perch of a claim for an equitable lien, and this leads us to a morass of conflicting and unclear appellate decisions. We start with Prairie State Bank v. United States (1896) 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. There, Sundberg & Company was the contractor. Hitchcock was a surety under a performance bond, and the bank took an assignment of the retainage in consideration of advances made by it to Sundberg. After Sundberg went broke, Hitchcock and the bank each made claim to the retainage. The court held that under the then effective anti-assignment law, there could be no pro tanto transfer of the retainage by Sundberg to the bank, and that the bank's claim had to rest on an equitable lien theory. Hitchcock, the court held, was subrogated to whatever rights Sundberg had, because Hitchcock completed the contract. The court phrased the question as follows:

"The sole question, therefore, is whether the equitable lien which the bank claims it has, without reference to the question of its subrogation, is paramount to the right of subrogation which unquestionably exists in favor of Hitchcock. In other words, the rights of the parties depend upon whether Hitchcock's subrogation must be considered as arising from and relating back to the date of the original contract, or as taking its origin solely from the date of the advance by him."

The Court reviewed authorities from England and this country, and ruled that the subrogation rights of the surety were superior to the equitable rights of the bank. In the course of its opinion, the Court said:

"That a stipulation in a building contract for the retention until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work as for him for whom the work is to be performed; *that it raises an equity in the surety in the fund to be created,* and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority.

.     .     .     .     .     .

"Sundberg & Company could not transfer to the bank any greater rights in the fund than they themselves possessed. Their rights were subordinate to those of the United States *and the sureties.* Depending, therefore, solely upon rights claimed to have been derived in February, 1890, by express contract with Sundberg & Company, it necessarily results that *the equity, if any, acquired by the Prairie Bank in the ten percent fund then in existence and thereafter to arise was subordinate to the equity*

*which had, in May, 1888, arisen in favor of the surety Hitchcock."* [5]

Next in the quadriga of Supreme Court cases is Henningsen v. United States Fidelity and Guaranty Co. (1907) 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547. Henningsen was the contractor, and U. S.F. & G. was a surety under what amounted to a combination performance and payment bond executed in accordance with the then applicable statute, the Heard Act. Henningsen defaulted, and the surety completed the contract, but in the meantime Henningsen had assigned the unpaid contract amounts to Spencer in trust for a bank which had loaned money to Henningsen. The Army quartermaster was threatening to honor the assignment, and the surety sued to enjoin any payments to the bank. Speaking for a unanimous court, Justice Brewer said:

"Passing to the merits of the case, *the question turns upon the respective equities of the parties.* Appellants concede that the bank was not by the making of the loans to Henningsen entitled to subrogation to the rights, if any, of the United States *or the laborers or materialmen,* and also that, if the guaranty company is entitled to subrogation to any right of the United States arising through the building contract, the bank can make no claim by reason of the assignment.
. . . .

"Henningsen . . . entered into a contract with the United States to construct buildings. The guaranty company was surety on that contract. Its stipulation was not merely that the contractor should construct the buildings, but that he should pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for. He did not make this payment, and the guaranty company, as surety, was compelled to and did make the payment. Is its equity superior to that of one who simply loaned money to the contractor to be by him used as he saw fit, either in the performance of his building contract or in any other way? We think it is. It paid the laborers and materialmen and thus released the contractor from his obligations to them, *and to the same extent released the government from all equitable obligations to see that the laborers and supply men were paid."*

*Henningsen,* by its very words, recognizes an equitable obligation on the part of the Government to materialmen, although government counsel here have devoted many pages of brief to arguing a contention that the government has absolutely no "equitable obligations to see that the laborers and supply men were paid." The unanimous Court for which Justice Brewer spoke thought otherwise.

Forty years were to pass before the Supreme Court took another look at the problem, and in that interim many lower court cases were decided in reliance on *Prairie State Bank* and *Henningsen.* Two cases which arose in Colorado are worthy of note by way of illustration, although neither had to do with either the Heard Act or the Miller Act. Western Lumber & Pole Co. v. City of Golden (1913) 23 Colo.App. 461, 130 P. 1027, resulted from the construction of a waterworks for the City of Golden. McDonald, the contractor, bought materials from the lumber company, but failed to pay for them before his contract was terminated, and the city refused to pay. The court first held that the lumber company had no mechanic's lien rights and then proceeded to consideration of a Colorado statute which required the withholding of funds "to satisfy the

---

5. The italicized language is of particular importance under our discussion of Pearlman v. Reliance Insurance Co. (1962) 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190, infra. Also, the last italicizing is worthy of note in connection with plaintiff's argument as to the payment to The First National Bank of Boston; i. e., the assignment to it of the March 24, 1971, payment of $190,747.00.

claims of laborers and subcontractors." The court held:

"It is conceded that the city made no attempt whatever to comply with the provisions of this statute or any thereof. It is true that nowhere in the letter of the act is the laborer or materialman given a specific lien on the funds in the hands of the city designed to pay for the improvement created, in part at least, by the contributions of such claimant, nor is there any penalty specifically provided for failure to do the things imposed by the statute, upon the public officials. Neither does the statute, in specific terms, by its letter confer a right upon anyone, by reason of the failure or omission of the public officials in this behalf. But where no express penalty is prescribed in a statute, it does not necessarily follow that no right is conferred by it upon those who may suffer by reason of its violation. A statute must be so construed and applied as to fully carry out the true intent and meaning thereof, and as we have already pointed out, our Supreme Court has expressly ruled in County Commissioners v. Lunney, supra [46 Colo. 403, 104 P. 495], that: 'The intention of the statute is the law.'

"The statute in unmistakable language, makes it the duty of the board to withhold the fund in question until its provisions shall have been complied with. For whom does it act in so withholding the fund? Not for the contractor; his interests are not thereby advanced. On the contrary, they are interfered with. There can be but one answer to the question: By the statute the city is made the agent or trustee for the unpaid claimant, and the fund in the hands of the city is impressed with a trust in his favor.

.    .    .    .    .    .

"Section 5408 of the act, in unequivocal terms, commands the city to pay the money due the claimant directly to him, when by agreement or judgment that amount shall have been ascertained. Thus, and thus only, may the city, whom the statute has made a trustee, dispose of the trust fund and discharge its duty under the trust imposed by law. The imposition upon the city to pay, by implication creates a right in the claimant to compel payment by proper legal action.

.    .    .    .    .    .

"The Legislature in the act before us had the right to impose the trust upon the particular fund, and leave the enforcement of the trust to the general law in reference thereto, as it appears to have done. Equity recognizes and protects certain rights ignored by law. The most important of these is the right of one in whose favor a use or a trust has been created.

" 'One who is equitably entitled to funds, the holder of which is legally obliged to pay to another, may maintain a bill against the debtor and legal creditor to establish a right and recover.'—16 Cyc., 88–90."

The court then noted that, as in the case here, the contract embodied the requirements of the statute, and the court held:

"It will be observed that the contract but declares the rights which the city possessed under the statute, the principal difference being that the statute, along with the right which it conferred upon the city to require evidence that the contractor had settled with his creditors, also imposed a duty upon the city. By the terms of its contract and the provisions of the statute, the city, in effect, invited parties to deal with McDonald and extend credit to him on the faith of that contract. Equity will not, under such circumstances, allow the city to say, when it is sued, that because it has seen fit to pay McDonald in violation of the statute it will repudiate the duty which, under that statute, it owed to those who had, on the faith of the contract between the city and McDonald, as supplemented by the statute, extended to the latter credit.

—Bispham's Principles of Equity, section 294.

"Statutes like the one under consideration are designed to shield, not to ensnare, laborers and materialmen, and it is the business of courts to see that their beneficent purpose is effectuated. Even in the absence of a specific statutory lien, equity and good conscience require the city to perform the imperative duty, imposed upon it by the statute, of withholding what was due the contractor until those who had supplied him with material for the construction of the city's water system could avail themselves of the provisions of the statute, and equity regards and treats that as done which in equity and good conscience should be done.

.    .    .    .    .    .

"This wholesome rule of equity requires us to hold that neither the city's duty nor the Lumber Company's right have been in any manner altered by the unauthorized payment by the city of McDonald's claim, and that the lumber company may yet look to the city for its pay for the material furnished the contractor, precisely as it might have done had no such payment been made by the city to him." [6]

E. I. DuPont DeNemours & Co. v. City of Glenwood Springs, (1927) 10 Cir., 19 F.2d 225, also involved a defaulting contractor on a water works, but it reached an opposite result. The Colorado statute involved in *Western Lumber* had been repealed, and there was neither a contractual nor a statutory obligation to require a bond. The contract was permissive as to bond, but it was not mandatory. On these facts it was held that there was no liability on the city's part to pay a materialman

where both the contractor and the surety defaulted and were judgment proof. The court held:

"There was no privity of contract between the city and the plaintiff in this case, no statute requiring the city to pay its claim or to act as a trustee for its benefit, and no agreement by the city to pay the plaintiff if the contractor failed to do so. A rule of law which would require a municipal corporation to pay for material furnished to a person to whom it lets a contract, because of the failure of its officers to require a sufficient bond, or because of their failure to exercise the privilege of withholding from the contractor payment of money due him, until claims for material are paid, would be against sound public policy."

But, our facts are different here. We have the Miller Act; we have the Code of Federal Regulations and we have the contract which mandated the payment bond. Moreover, the opinion in *E. I. DuPont* quotes at length and with approval from Merchants' & Traders' Bank v. Mayor, Aldermen and Common Council of the City of New York, 97 N.Y. 355, where it was held that under a contract requiring protection for materialmen:

"The city in such a contract assumed no express liability to pay the laborers and materialmen, and cannot be sued upon such a liability [as we have here held]; but it is placed under an implied obligation to hold the money as trustee according to the terms and effect of the contract which can be enforced in an action to which all persons interested in the money are made parties."

Whatever may have been the equitable rights of materialmen in 1927, where

6. This case presaged the recent decisions of the United States Supreme Court having to do with standing, and defendant's arguments that plaintiff does not have standing (which are discussed later) are rejected. See, for example, Data Processing v. Camp (1970) 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Sierra Club v. Morton (1972) 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636, and Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency (1973) 481 F.2d 116. I do not agree with the approach of the Court of Claims to the standing question as expressed in United States Fidelity & Guaranty Co. v. United States (Ct.Cl.1973) 475 F.2d 1377.

neither contract nor statute required a bond, it is time to return to the developments in the law evidenced by the two remaining Supreme Court cases to be discussed. The dichotomy of Circuit Court interpretation of United States v. Munsey Trust Co. (1947) 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022, emphasizes that the scope of its holding is unclear. The naked question decided was phrased by the Court as being, "Whether percentages retained pursuant to contract by the United States may be subject to its set-off claims despite the claims of a surety who has paid laborers and materialmen." That question was answered in the affirmative, but it was the Court's discussion which led to the differing interpretations. However, insofar as our immediate question is concerned, *Munsey Trust* does say, "We need not decide whether laborers and materialmen would have any claim to the retained percentages if both contractor and surety failed to pay them." Here, the contractor has failed to pay; there is no surety, and, under *Munsey Trust,* the question was left open.

American Surety Company of New York v. Hinds (1958) 10 Cir., 260 F.2d 366, did not reach the open question, but it did involve the reach of the *Munsey Trust* decision. In meeting the requirements of the payment bond, American Surety paid the materialmen of a bankrupt contractor and claimed the retainage, less setoffs due the government. It said that its rights were superior to the rights of the Trustee in bankruptcy. The question presented was,

> "Did the surety, by reason of its payment of labor and material bills incurred by the contractor prior to its adjudication as a bankrupt, acquire any rights to the net contract funds superior to the rights of the Trustee?"

Chief Judge Lewis wrote that *Munsey Trust* was not limited in its holding to situations where the government was asserting a setoff, although he recognized that there was authority to the contrary. It was held:

> "The recovery allowed the surety in these cases then finds comfort in earlier authority recognizing the equitable claims of sureties to be superior to those whose claims arise from the loan of money to the contractor. Prairie State National Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Standard Accident Ins. Co. of Detroit, Mich. v. Federal Nat. Bank of Shawnee, Okl., 10 Cir., 112 F.2d 692, and cases cited.

> "We are not conviced, however, of the merit of reasoning which limits the clear holding of Munsey to factual situations where the government is a direct claimant. Mr. Justice Jackson, speaking for the court, notes that the claim of the surety must fail for *two* reasons, both the strength of the government's right to set-off and the weakness of the surety' claim to equitable rights in the fund. The reasoning of the opinion in the latter regard is in no way dependent upon the United States being a claimant.

> "The rights of a surety are largely derivative in nature. Having paid the laborers and materialmen, appellant may claim subrogation to their rights. But since laborers and materialmen have no enforceable rights against the United States the surety can rise no higher than the basis of the subrogation. The very purpose of the payment bond required under the Miller Act is to shift the ultimate risk of nonpayment from workmen and suppliers to the surety. The United States does not retain funds for that purpose for it is said:

>> " 'But although we have assumed, for the purposes of another argument, that assurance that laborers and materialmen will be paid is one of the reasons for retaining the money, it seems more likely that completion of the work on time is the only motive. [Citations] It is hardly reasonable to withhold money in order to assure payments which perhaps can be made only from the money earned. In any

event, we are not prepared to apply law relating to security to unappropriated sums which exist only as a claim.' United States v. Munsey Trust Co., 332 U.S. at page 243, 67 S.Ct. at page 1603.

"It would seem clear that if the surety can claim no enforceable right of subrogation through the creditors paid and can assert no equitable claim to the fund itself, either in its own right or through the United States, then the Trustee must here prevail and appellant's claims must await their presentation under the administration of the bankruptcy proceedings. The Ninth Circuit has similarly concluded in Phoenix Indemnity Co. v. Earle, 218 F.2d 645."

In the matter of Dutcher Construction Corporation, (1962) 2 Cir., 298 F.2d 655, read *Munsey Trust* more narrowly, and Judge Medina's views were later affirmed when *Dutcher* was affirmed by the Supreme Court in Pearlman v. Reliance Insurance Co., (1962) 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190. In *Dutcher Construction Corporation,* the Court went back to *Prairie State Bank* and *Henningsen,* decided under the Heard Act, and held that the same reasoning applied to cases arising under the Miller Act. It was said:

"The case is interesting and important, as it involves the controversial question of whether a surety, having paid materialmen and laborers pursuant to the terms of a payment bond, but not having completed performance of work required by the prime contract with the Government, is entitled by way of subrogation to the fund paid to the trustee in bankruptcy by the Government for the work done by the contractor prior to the termination of the contract. We think the legal principles formulated by the courts on this subject under the Heard Act, 28 Stat. 278 (1894), amended 33 Stat. 811 (1905), were not affected or altered by the Miller Act, 49 Stat. 793 (1935), 40 U.S.C.A. § 270a, which superseded the Heard

Act. With all due respect to our brothers of the 9th and 10th Circuits, we believe they have misconstrued the Supreme Court decision in United States v. Munsey Trust Company, 1947, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022, and we disagree with the decisions in those Circuits holding the surety not entitled to subrogation. Phoenix Indemnity Co. v. Earle, 9 Cir., 1955, 218 F.2d 645; American Surety Co. v. New York v. Hinds, 10 Cir., 1958, 260 F.2d 366.

.    .    .    .    .    .

"There is nothing to indicate that the priorities of the materialmen and laborers were intended to be eliminated, or affected in any way by the new provisions of the Miller Act. Under the Heard Act, and under the Miller Act as well, the security for the materialmen and laborers was to stand in place of a lien on the property under construction, as no lien attaches to Government property. The purpose under each of these Acts was the same, to encourage laborers and those furnishing materials to undertake the construction of the Government facility, and to make sure that those who did so and created the product under construction should be secured out of the job itself rather than on the general credit of the prime contractor.

"It follows we think that the same priorities held to exist under the Heard Act continue to exist under the Miller Act. *If the Government was under 'equitable obligations to see that the laborers and supply men were paid'* (208 U.S. [404] at page 410, 28 S.Ct. [389] at page 391, 52 L.Ed. 547), [Henningsen v. U. S. F. & G.] this would seem sufficient to support the claim of the surety for priority, *and such 'equitable obligations' surely are not less under the Miller Act* than they were under the Heard Act.

.    .    .    .    .    .

"The decisions of the 9th and 10th Circuits in Phoenix and Hinds above referred to are based squarely on the premise that the Supreme Court in

Munsey had sustained the Government's claim to a set-off partly because of 'the weakness of the surety's claim to equitable rights in the fund.' See Hinds, 260 F.2d at page 368. Perhaps this impression stems from the following dictum in Munsey, 332 U.S. at page 242, 67 S.Ct. at page 1603:

" 'We need not decide whether laborers and materialmen would have any claim to the retained percentages if both contractor and surety failed to pay them. Even if they do, certainly those would be rights to which the surety could not be subrogated for by hypothesis it would have done nothing to earn subrogation.'

"In any event, we think the quotations from Munsey in the opinions in Phoenix and Hinds have been misconstrued. If the Supreme Court intended to make any comment with respect to the situation now before us, it was merely to say they held the point open for decision in the future. Of course, if the surety failed to pay materialmen and laborers, the surety 'would have done nothing to earn subrogation.' Moreover, the fact that 'laborers and materialmen have no enforceable rights against the United States,' 260 F.2d at page 368, is beside the point. The question is not whether the laborers and materialmen have rights enforceable against the Government, but whether they have an equitable priority in the retained payments.

"In National Surety Corporation v. United States Ct.Claims, 1955, 133 F.Supp. 381, 132 Ct.Cl. 724, cert. denied sub nom. First National Bank in Houston v. United States, 1955, 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793, the Court said at page 384:

" '[T]he laborers and materialmen have the equitable right to assert a claim to moneys in the hands of the defendant [the United States] which are due the contractor. When the surety pays the laborers and materialmen, it becomes subrogated to their right to assert an equitable claim to the moneys in the hands of the defendant. It has frequently been held that they have equitable priority to these moneys over the general creditors of the contractor and over his assignees. [Numerous citations omitted.]

\* \* \* \* \* \*

" 'In United States v. Munsey Trust Co., supra, the Supreme Court said that the United States was not legally liable to laborers and materialmen, but it did not say that laborers and materialmen could not assert an equitable claim to moneys in the hands of the United States payable under the contract. We think they can. To permit them to do so in no way interferes with the full exercise of the sovereign powers of the United States. It does not subject the defendant to liability beyond the amount it has in its hands confessedly due and owing to somebody.'

"Royal Indemnity Co. v. United States, 1950, 93 F.Supp. 891, 117 Ct. Cl. 736, is to the same effect.

"The principle established by Munsey was that the Government's right to a set-off based on sums due from the contractor on other jobs was superior to any claim of the surety by way of subrogation. Furthermore, there is language in Munsey that justifies, if not compels, it to be limited to situations in which the United States is asserting a claim of its own to the retained funds."

As mentioned, *Dutcher Construction Corporation* was affirmed by the Supreme Court in Pearlman v. Reliance Insurance Co. (1962) 371 U.S. 132, 83 S. Ct. 232, 9 L.Ed.2d 190, and this is the last of the Supreme Court decisions to be discussed. The facts, of course, were those present in *Dutcher Construction Corporation,* and in affirming the Second Circuit's interpretation of the limit-

ed holding in *Munsey Trust,* the Court said:

"The Prairie Bank case thus followed an already established doctrine that a surety who completes a contract has an 'equitable right' to indemnification out of a retained fund such as the one claimed by the surety in the present case. The only difference in the two cases is that here the surety incurred his losses by paying debts for the contractor rather than by finishing the contract.

"The Henningsen case, decided 12 years later in 1908, carried the Prairie Bank case still closer to ours. Henningsen had contracts with the United States to construct public buildings. His surety stipulated not only that the contractor would perform and construct the buildings, but also, as stated by the Court, that he would 'pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for.' Henningsen completed the buildings according to contract but failed to pay his laborers and materialmen. The surety paid. This Court applied the equitable principles declared in the Prairie Bank case so as to entitle the surety to the same equitable claim to the retained fund that the surety in the Prairie Bank case was held to have. Thus the same equitable rules as to subrogation and property interests in a retained fund were held to exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen. These two cases, therefore, together with other cases that have followed them, establish the surety's right to subrogation in such a fund whether its bond be for performance or payment. Unless this rule has been changed, the surety here has a right to this retained fund.

"It is argued that the Miller Act changed the law as declared in the Prairie Bank and Henningsen cases. We think not. Certainly no language

of the Act does, and we have been pointed to no legislative history that indicates such a purpose. The suggestion is, however, that a congressional purpose to repudiate the equitable doctrine of the two cases should be implied from the fact that the Miller Act required a public contract surety to execute two bonds instead of the one formerly required. It is true that the Miller Act did require both a performance bond and an additional payment bond, that is, one to assure completion of the contract and one to assure payments by the contractor for materials and labor. But the prior Acts on this subject, while requiring only one bond, made it cover both performance and payment. Neither this slight difference in the new and the old Acts nor any other argument presented persuades us that Congress in passing the Miller Act intended to repudiate equitable principles so deeply imbedded in our commercial practices, our economy, and our law as those spelled out in the Prairie Bank and Henningsen cases.

"The final argument is that the Prairie Bank and Henningsen cases were in effect overruled by our holding and opinion in United States v. Munsey Trust Co., supra. The point at issue in that case was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. *We held that the Government could exercise the well-established commonlaw right of debtors to offset claims of their own against their creditors. This was all we held.* The opinion contained statements which some have interpreted as meaning that we were abandoning the established legal and equitable principles of the Prairie Bank and Henningsen cases under which sureties can indemnify themselves against losses. But the equitable rights of a surety declared in the Prairie Bank case as to sureties who complete the perform-

ance of a contract were expressly recognized and approved in Munsey, and the Henningsen rule as to sureties who had not completed the contract but had paid laborers was not mentioned. Henningsen was not even cited in the Munsey opinion. We hold that Munsey left the rule in Prairie Bank and Henningsen undisturbed. We cannot say that such a firmly established rule was so casually overruled.

"We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it."

*Prairie State Bank* upheld that which the Court described as an "equitable lien" in favor of the surety. The Court said that Henningsen turned on the "respective equities of the parties," and that the government had "equitable obligations to see that the laborers and supply men were paid." *Dutcher Construction Corporation* recognized that "the Government was under 'equitable obligations' to see that the laborers and supply men were paid," and it held that "such 'equitable obligations' surely are not less under the Miller Act than they were under the Heard Act." *Pearlman* emphasized that *Munsey Trust* did not overrule *Prairie State Bank* and *Henningsen:*

"We held [in Munsey Trust] that the Government could exercise the well-established common law right of debtors to offset claims of their own against their creditors. *This was all we held.*"

Then, and most importantly, *Pearlman* said that *"the laborers and materialmen had a right to be paid out of the fund."*

Repeatedly, and, with grandiloquent rhetoric, counsel for the Postal Service tries to escape this language by insisting that it found its way into the opinion by inadvertence on the part of Justice Black. Apart from the fact that Justice Black was not given to incorporating inadvertent language in his opinions, the concurring opinion of Justice Clark emphasizes that the majority opinion meant exactly what it says. After quoting from *Munsey Trust* to the effect that laborers and materialmen do not have enforceable rights against the United States, he said that *Pearlman* holds "that laborers and materialmen (have) 'rights' to funds in the Government's hands." Justice Clark did not agree with this particular holding of the majority, but he certainly spelled out what the majority meant in language eloquent Postal Service counsel here do not face up to.

■ I think that *Pearlman* demands that with the absence of the payment bond and with the sloppy administration of the contract in mind, Kennedy had an equitable lien on the retainage—both the actual retainage and the funds which should have been retained. In the words of *Pearlman,* "the laborers and materialmen had a right to be paid out of the fund."

At time of trial Postal Service counsel invited attention to United States Fidelity & Guaranty Co. v. United States (1973) Ct.Cl., 475 F.2d 1377. U.S. F. & G. had paid out the amount of its payment bond and had been required to make no payments under its performance bond. The argument boiled around $4,445.22 retainage. Although in *Pearlman,* the Supreme Court said that all that was held in *Munsey Trust* was that "the Government could exercise the well-established common law right of debtors to offset claims of their own against their creditors," the Court of Claims relied on *Munsey Trust* as holding that "laborers and materialmen do not have enforceable rights against the United States for their compensation." The case did say this, but *Pearlman* em-

phasizes that the case does not hold this. The opinion of the Court of Claims continued:

"There is, however, a problem in reconciling Munsey and Pearlman with respect to their discussions of the measure of the rights of the laborers and materialmen, even though the cases stand side-by-side. It is a short step from Pearlman to infer that if the subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly, which is in complete conflict with the language in Munsey, as recognized by Justice Clark's concurring opinion in Pearlman.

"The dilemma may be resolved in a number of ways, but the most apparent might be by noting that the Court in Pearlman stated that the surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the defendant. If this interpretation of Pearlman is adopted then Munsey is in complete harmony with it and the Pearlman decision is of no aid to these subcontractors. This conclusion likewise follows our decision in Continental Cas. Co. v. United States, supra, in which we stated:

"' * * * The United States had the right to use the money in its hands to pay laborers and materialmen (Pearlman v. Reliance Insurance Company, 371 U.S. 132 [83 S.Ct. 232, 9 L.Ed.2d 190] (1962); National Surety Corp. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724 (1955)), but the laborers and materialmen could not force it to do so. [Citing Munsey Trust.].'

[164 Ct.Cl. [160] at 162.]

"Closely linked to this view is the fact that in all the cases touching on this issue the rights of the various parties have been defined in situations in which the issue is one of priority between competing interests in the fund held by the Government. None have involved a plaintiff-subcontractor directly asserting a claim to money held by the Government. The subcontractors do possess equitable rights to the retained funds vis-a-vis other claimants to the money, but their rights cited by the courts in deciding, for example, that a surety who pays the subcontractors on a contract has priority via subrogation to the retained funds over an assignee to the prime contractor, do not necessarily include or imply a right in the subcontractor itself to sue the Government. The language that has been used by the courts in this respect is broad, but not so broad as to open a whole new area of litigation to parties that have consistently been found to have no standing to sue the United States. For this reason the court declines to grant the subcontractors' standing to sue for the amount retained by the Government under the contract."

The court then "recommended" that the Navy pay the retainage to the subcontractors as a matter of fairness, and sua sponte it extended the time for a motion for a new trial *"in consideration . . . of the general equitable obligation the Government owes, under proper circumstances, to the subcontractors who are the laborers and materialmen."* This was done to permit a showing by the surety that the subcontractors were paid in full, but, since it would have cost U. S. F. & G. more than the $4,445.22 at stake to do this, it rejected the court's offer.

United States Fidelity & Guaranty Co. v. United States is subject to some distinctions. One such is the statute which

says that the Postal Service can sue or be sued. Another is the fact that in U. S. F. & G., there was a payment bond and the subcontractors were paid to the limits of that bond, while here there was no bond. The Court of Claims itself might distinguish on this ground, because in National Surety Corp. v. United States (1955) 133 F.Supp. 381, 132 Ct. Cl. 724 [cited by the Supreme Court in *Pearlman* as recognizing equitable interests of materialmen] the Court of Claims said that *the Miller Act payment bond "relieves the United States from its equitable obligation to see that laborers and material men are paid."* That same opinion said:

"Since the United States is under an equitable obligation to see that laborers and materialmen are paid . . . *the laborers and materialmen have the equitable right to assert a claim to moneys in the hands of the [United States] which are due the contractor."*

In that case the Court of Claims recognized a right of materialmen to assert a claim against funds in the hands of the United States, and all that I hold is that they have a right to assert a claim against funds in the hands of the United States or funds which, under its own regulations, should be in its hands. And, it is to be noted that a distinction between bonded and unbonded jobs was recognized in United Pacific Insurance Co. v. United States (1963) 319 F.2d 893, 162 Ct.Cl. 361; United States for the use of Brown Bros., Inc. v. F. D. Rich Co. (1968) D.C.S.C., 285 F.Supp. 572, and United States for the use of Reuter v. MacDonald Construction Co. (1968) D.C.E.D.Mo., 295 F.Supp. 1363.

However, I do not choose to rest my decision on any effort to distinguish *United States Fidelity and Guaranty Co. v. United States,* if the case holds what Postal Service counsel claims it holds. If the case holds that where statute and contract require a payment bond, but no bond is filed; where the contracting of-

ficers are negligent in permitting payments in excess of the retainage agreed to, and where payments are knowingly made for the purpose of paying those funds to assignee bank to the prejudice of subcontractors and that even with these facts present the subcontractors have no rights and no standing to assert rights against the government, I disagree with the decision and elect not to follow it. If, as the Postal Service argues, the case stands for these things [and I don't think it does] it must gain life from *Munsey Trust.* Yet, *Munsey Trust* itself said:

"We need not decide whether laborers and materialmen would have any claim to the retained percentages, if both contractor and surety failed to pay them."

I must decide whether a subcontractor has a right to the percentages retained and to those which should have been retained where the contractor failed to pay and where there is no surety, albeit a surety was required by statute and contract. I hold that a contractor has such a right.

■ Two additional matters deserve brief mention. Plaintiff says that the Postal Service can recover the money paid to The First National Bank of Boston, and plaintiff cites in support of this proposition J. W. Bateson Company, Inc. v. United States (1962) 5 Cir., 308 F.2d 510; Stone v. United States (1961) 8 Cir., 286 F.2d 56, and Newark Ins. Co. v. United States (1960) 181 F.Supp. 246, 149 Ct.Cl. 170.[7] Certainly I should not and do not rule on this contention in the absence of the bank, but suffice it to say that American Fidelity Company v. National City Bank of Evansville (1959) 105 U.S.App.D.C. 312, 266 F.2d 910, casts doubt on plaintiff's assertion. Resolution of this question must await another day in another court.

But, if as I have held, Kennedy has an equitable lien on the undisbursed and the wrongfully disbursed funds, the Postal Service does not escape liability

7. See, also *Prairie State Bank v. United States,* supra, and footnote (5) of this opinion.

by virtue of its wrongful disbursement. Fireman's Fund Ins. Co. v. United States (1970) 421 F.2d 706, 190 Ct.Cl. 804; Home Indemnity Co. v. United States (1970) D.C.W.D.Mo., 313 F.Supp. 212; Hanover Ins. Co. v. United States (1967) D.C.S.D.N.Y., 279 F.Supp. 851, and Newark Ins. Co. v. United States (1969) 169 F.Supp. 955, 144 Ct.Cl. 655.

It is ordered that judgment shall enter in favor of plaintiff and against the defendant for $61,281.31, together with interest thereon as permitted by law, plus such costs as are allowable under 28 U. S.C. § 2412. Plaintiff's counsel are requested to submit an appropriate form of judgment within ten (10) days.